534 S.E.2d 50

**J.M., L.M., His Natural Mother and Guardian, and P.M., His Natural Father and Guardian, Plaintiffs Below, Appellants,**

v.

**The WEBSTER COUNTY BOARD OF EDUCATION, Defendant Below, Appellee.**

No. 26904.

Supreme Court of Appeals of West Virginia.

Submitted April 12, 2000.

Decided July 10, 2000.

Concurring and Dissenting Opinion of Justice Starcher July 20, 2000.

1. The Redevelopment Authority's power to act is found in W.Va.Code § 16–18–8 (1951).

William W. Talbott, Esq., Webster Springs, West Virginia, Attorney for Appellants.

Basil R. Legg, Jr., Esq., Clarksburg, West Virginia, Attorney for Appellee.

McGRAW, Justice:

J.M., a minor, appeals an order of the Circuit Court of Webster County that upheld a decision of the Webster County Board of Education expelling him for possession of a firearm on school property in violation of W. Va.Code § 18A–5–1a (1996), also known as the "Safe Schools Act." He argues that the actions taken against him by the principal of his high school and the county board of education were procedurally deficient, and that, although he had a gun on his person, he did not have the necessary intent to be found in violation of the statute. For the reasons set forth below, we affirm the decision of the trial court.

## I.

## BACKGROUND

We relate the facts with some detail because these details are important to appellant's argument. On Tuesday, May 12, 1999, appellant J.M., a 15–year–old student at Webster County High School, misbehaved and was reported to the principal. For this infraction,[1] the principal suspended J.M. for two days, effective noon that same day. The principal called J.M.'s mother, who was a teacher at a local elementary school, to come to the high school and retrieve J.M. On their way back to the mother's place of employment, J.M.'s father happened to see the two of them drive by, so he followed them to the elementary school to learn why J.M. was not in class.

J.M.'s father was extremely upset to learn of his son's two day suspension and, as a result, made a decision to remove J.M. from school and "put him to work" immediately. Toward this end, the father went to the high school and demanded the contents of J.M.'s locker and announced that he was withdrawing J.M. from school. The father then went to a local lumber yard to obtain a job for

J.M., but was unable to find the owner of the business.

J.M.'s father then returned to the elementary school where J.M.'s mother was employed and retrieved J.M., who allegedly did not wish to accompany his father. The two made a second attempt to find someone at the lumber yard, but failed. They then proceeded home and parked in the garage. Upon exiting the family truck, J.M. hit the family lawnmower with the truck door, to the extreme displeasure of his father. At that point, the father picked up an axe or hatchet and declared to J.M. that, if the truck door were damaged, that he, the father, would "pole-ax" him, and that he, J.M., might just "end up like that Linkous boy."[2]

The father then went out into the yard, leaving J.M. in the house alone. The family kept several firearms in the home, most of them in a gun cabinet. With his father outside, J.M. searched for and found the keys to this gun cabinet. Using the keys, J.M. secured all of the firearms by locking them into the gun cabinet. After locking the cabinet, J.M. hid the keys under some clutter in the corner of the room. After hiding the keys, J.M. discovered on top of the cabinet a box of ammunition and one last gun, a .45 caliber revolver with a nine inch barrel. According to J.M., before he could secure the .45, he looked out the window and saw his father returning. Not wanting his father to discover him with the gun, J.M. stuck the .45 in the back of his pants and pocketed the shells.

After the two shared some uncomfortable silence, J.M.'s father lay down to take a nap. J.M. took this opportunity to remove himself from his father vicinity and departed, leaving on foot for a friend's house, where he hoped to await his mother's return from work. About 15 minutes later, J.M.'s father awakened and was enormously disappointed to learn of J.M.'s unauthorized exodus. He set off down the road in his truck to find J.M., who had covered about half a mile in his

---

1. The record reflects that this was at least the tenth time that school year that J.M. had been disciplined for behavior problems.

2. It was apparently well known in Webster County that one Mr. Linkous had been charged recently in connection with the shooting death of his own son.

abortive bid for freedom. J.M. had not discarded the gun or ammunition, and both were still concealed upon his person.

Having reacquired J.M., the father proceeded again to the lumber company, where he intended to sign J.M. up for a job as soon as possible. After reaching the lumber yard, J.M.'s father left J.M. in the truck while he went inside to inquire about the job. J.M.'s father learned that he would have to have a form signed at the school before J.M. could be allowed to work at the lumber yard. J.M.'s father returned to the truck, and the two drove to the school to obtain the proper form.

At the school, they parked near the main entrance and J.M.'s father left J.M. at the truck while he went in search of the principal. School was over for the day, so J.M.'s father had no luck finding the principal and returned to the truck. J.M., who was some six feet, three inches in height, and weighed close to three hundred pounds, had lettered in football and had a close relationship with his football coach. Hoping that J.M.'s football coach might be able to provide a signed form, J.M.'s father drove them to another building on school property in search of the coach. J.M. was not in favor of this visit with the coach, but acceded to his father's demands and accompanied him into the building, with the gun and ammunition still hidden in his pants.

Upon finding the coach, J.M.'s father embarked upon an animated recounting of the events of the day. The record indicated that J.M.'s father was quite upset and made use of some colorful language in expressing his distaste for J.M.'s behavior. After several minutes, this heated discussion culminated in J.M.'s father speculating as to just what sort of unsavory employment J.M. might have to resort if he did not start taking his educational responsibilities more seriously.

The coach found the particular expletives chosen by J.M.'s father to be quite objectionable, and feared that the argument might escalate into a physical altercation, so he asked J.M.'s father to go outside and calm down. He complied, leaving J.M. and the coach alone. After his father left the room, J.M. took out the loaded gun and fifty-six

additional rounds of ammunition, and surrendered them to the coach, asking the coach to "take care of them," and adding that he thought his father "was going to kill him." The coach secured the gun and ammunition in a filing cabinet and took J.M. to the nearby state police barracks and reported the incident to the troopers, and subsequently reported the incident to the school principal and the superintendent.

The next day, the principal and the superintendent of schools held an "informal conference" with J.M., his mother, coach Rogers, the county prosecuting attorney, and a local state police trooper. J.M., his mother, and coach Rogers gave their accounts of the events. Apparently, the principal and superintendent then continued this conference with J.M. and his mother after the others had left, and attempted to persuade J.M. and his mother to stipulate to a 365 day suspension, which they refused.

At the conference, the principal determined that J.M. probably had violated the Act, and by letter dated that day, May 13, 1999, notified both the superintendent and J.M.'s mother that J.M. would be suspended for a period of ten days. The principal then notified J.M.'s parents by letter dated May 18, 1999, that the board of education would hold a hearing on May 24, 1999, and that J.M. had the right to be represented by counsel at the hearing.

At the board hearing of May 24, 1999, J.M. was represented by counsel, and had the opportunity to present evidence, call witnesses, and cross-examine witnesses. J.M., his father, his mother, and coach Rogers all testified about the events of May 12. After the hearing, the board voted to suspend J.M. for 365 days and place him in an alternative education program. The board notified his parents of this decision by letter dated the next day.

Subsequently, J.M. appealed this decision to the Circuit Court of Webster County, which conducted a hearing on August 2, 1999. At that hearing, J.M., his mother, his father, and coach Rogers all testified again. At the close of the hearing, the judge denied J.M.'s request for an injunction, and ordered the

parties to submit briefs. Thereafter, the court issued an order on August 23, 1999, which upheld J.M.'s suspension, from May 13, 1999, to May 12, 2000. It is from that order that J.M. now appeals. For the reasons set forth below, we affirm the decision of the trial court.

## II.

### STANDARD OF REVIEW

 In this case, we are asked to review the lower court's interpretation of the Safe Schools Act. In such a case, our review is *de novo*. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995); Syl. pt. 1, *McKinley v. Fairchild Intern., Inc.*, 199 W.Va. 718, 487 S.E.2d 913 (1997).

## III.

### DISCUSSION

 First, because J.M.'s period of expulsion was scheduled to end effective May 12, 2000, we must address the question of mootness. We were faced with a similar question in the case of *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997), where the expulsion of the student in that case had also ended before we had the opportunity to decide the case. We noted that our treatment of technically moot cases is guided by the test established in syllabus point 1 of *Israel v. West Virginia Secondary Schools Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989):

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the

trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

*Id.* As we went on to note in *Cathe A.*, each of the three factors is present in this case, in that there may well be other students whose cases are awaiting the outcome of this appeal, students and administrators are interested in how the statute should be applied in the future, and a statute that calls for one year expulsions, by its very nature, will continue to spawn controversies with limited life spans that end before the appellate process can run its course.

*Cathe A.* was not the first time we addressed the Safe Schools Act. Nor is the instant case the first in which we have been faced with the expulsion of a fifteen-year old boy who was found with a gun on his person while on school premises. In *Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 484 S.E.2d 909 (1996), the student also had a gun at school, and was also expelled for a year, but we were asked to address a different issue. In that case we examined whether or not the state had to provide some sort of alternative education for students expelled under the Safe Schools Act, and held:

> [T]he "thorough and efficient" clause of Article XII, Section 1 of the *West Virginia Constitution* requires, the creation of an alternative program for pupils suspended or expelled from their regular educational program for a continuous period of one year for the sole reason of possessing a firearm or other deadly weapon at an educational facility.

Syl. pt. 4, in part, *Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 484 S.E.2d 909 (1996).

 We later examined the constitutionality of the statute in question. In *Cathe A.*, *supra*, we were asked whether or not the requirement of a one-year expulsion for violating the statute could pass constitutional muster; we answered that question in the affirmative:

> Because the State has a compelling interest in providing a safe and secure environment to the school children of this State

pursuant to *W. Va. Const.* art. XII, section 1, and because expulsion from school for as much as 12 months pursuant to the provisions of the Productive and Safe Schools Act, W. Va.Code, 18A–5–1a(g) [1995] is a reasonably necessary and narrowly tailored method to further that interest, the mandatory suspension period of the Act is not facially unconstitutional.

Syllabus Point 3, *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997).[3]

Turning again to the instant case, J.M. claims that the principal and the board did not follow the prescribed procedures outlined in the Act. Thus he argues that the circuit court erred when it found that any procedural deficiencies alleged by J.M. did not warrant a reversal of his expulsion. J.M. also argues that the lower court erred when it made certain determinations about the nature of the offense. Specifically, J.M. questions that portion of the lower court's order of August 23, 1999, in which the court found that possession of a gun on school property in violation of the Act was an offense *malum prohibitum*, and therefore did not require intent or knowledge by the offender for a court to still find the offender guilty of a violation. However, the court also ruled that, even if a violation of the Act were instead an offense *malum in se*, which would require a finding of knowledge or intent on the part of the offender, that J.M. possessed the requisite guilty knowledge or intent to be found in violation of W. Va.Code § 18A–5–1a (1996).

Before addressing these specific assignments of error, we shall analyze the procedural requirements of the Safe Schools Act. The Code section that governs this case calls for a student's expulsion in certain situations:

(a) A principal shall suspend a pupil from school or from transportation to or from the school on any school bus if the pupil, in the determination of the principal, after an informal hearing pursuant to subsection (d) of this section, has: (i) Violated the provisions of subsection (b), section fifteen, article two, chapter sixty-one of this code; (ii) violated the provisions of subsection (b), section eleven-a, article seven, chapter sixty-one of this code; or (iii) sold a narcotic drug, as defined in section one hundred one, article one, chapter sixty-a of this code, on the premises of an educational facility, at a school-sponsored function or on a school bus. . . .

(f) The county board shall hold the scheduled hearing to determine if the pupil should be reinstated or should, or under the provisions of this section, must be expelled from school. . .

(g) Pupils may be expelled pursuant to the provisions of this section for a period not to exceed one school year, except that if a pupil is determined to have violated the provisions of subsection (a) of this section the pupil shall be expelled for a period of not less than twelve consecutive months:

W.Va.Code § 18A–5–1a (1996). So in order to determine if J.M.'s actions violated W. Va.Code § 18A–5–1a (1996), we must first examine section 61–1–11a,[4] which deals with carrying firearms on school property:

(b)(1) It shall be unlawful for any person to possess any firearm or any other deadly weapon on any school bus as defined in section one, article one, chapter seventeen-a of this code, or in or on any public or private primary or secondary education building, structure, facility or grounds thereof, including any vocational education building, structure, facility or grounds thereof where secondary vocational education programs are conducted or at any school-sponsored function.

W.Va.Code § 61–7–11a (1995).[5]

There is no question that J.M. had a firearm on his person while on school grounds.

---

**3.** We also stated in that case that circumstances might exist where the state would, temporarily, not have to provide alternative schooling for a student suspended under the Act. *See* syllabus point 5, *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997).

**4.** The other Code section referenced is W. Va. Code § 61–2–15, which deals with assault or battery upon school employees. No such assault or battery occurred in this case, so we need not discuss this provision.

**5.** The statute goes on to list certain exceptions to this general rule, none of which, however, apply in this case.

However, J.M. argues that he had not intended to be upon school grounds and was transported to the school by his father and against his will. Thus he argues that his lack of the mental element or *mens rea* of "intent" makes it impossible for him to be guilty of "possession" as contemplated by the statute. He also argues that the offense in question is *malum in se*, and thus requires an intent element, and that the lower court erred in determining that violating the statute was *malum prohibitum*. J.M. goes on to argue that by ruling that the offense requires no intent or knowledge, the lower court essentially gave strict liability effect to the statute. He claims that this ruling, if upheld, would leave no room for discretion by either principals or boards of education when the circumstances of a particular case, such as this case, might warrant.

In an earlier case, we discussed this distinction, drawing upon the well-known criminal law treatise authored by LaFave & Scott:

> It has been said that a crime of which a criminal intent is an element is *malum in se*, but if no criminal intent is required, it is *malum prohibitum;* and that generally a crime involving "moral turpitude" is *malum in se*, but otherwise it is *malum prohibitum*. In a general way, it may be said that crimes which are dangerous to life or limb are likely to be classified as *malum in se*, while other crimes are more likely to be considered *malum prohibitum*.

*State v. Vollmer,* 163 W.Va. 711, 714, 259 S.E.2d 837, 839 n. 4 (1979), (quoting LaFave and Scott, *Criminal Law* at 29 (1972)). From even this short discussion, it is evident that making such a determination is not an exact science. We do not find it necessary to explore this fine distinction in our criminal jurisprudence to decide the outcome of this case. We are also reluctant to accept either J.M.'s or the lower court's categorization of the statute. If we adopt J.M.'s interpretation, we invite an appeal to this court on nearly every expulsion, challenging proof of a student's intent. If we adopt the view that the statute calls for a mechanical adherence and expulsion in every circumstance when a student has a gun on his or her person, we remove the discretion of the principal and the board of education. We decline to follow either approach.

While we are aware that almost any student charged with any violation at school is likely to make all manner of excuses for his or her actions, we also recognize that there might be circumstances where a child is found with a gun at school, but could not be said to be "in possession" of that gun in a manner that violates W. Va.Code § 18A–5–1a (1996). For example, an older student might secretly place a gun in the bookbag of a second grade boy who was either unaware of the gun, or had been told that the older student would beat him up if he disclosed the weapon. However, in that hypothetical case, just as in this case, it would be up to the finder of fact to determine if that second grader "possessed" a firearm on school property. With regard to the statute under consideration, W. Va.Code § 18A–5–1a (1996), we have two fact finders, the principal and the board of education. In order to elaborate upon this point, we shall examine the statute, and we divide it, for purposes of explanation, into two general parts:

### 1. *The Principal's Duties*

As we have noted, the statute in question, W. Va.Code § 18A–5–1a (1996), demands that a principal suspend a student who, among other things, possesses a firearm on school property. There are obviously several elements to both the offense and the process for dealing with an offending student, and we will attempt to address these in a logical fashion.

Although not mentioned first in the statute, the first step of the process starts with the principal of the school where the alleged violation has occurred. Once someone reports an incident, if the principal believes that the alleged violation would warrant suspension, he or she must hold an "informal hearing" with the student and the student's parents:

> (d) ... If the principal determines that the alleged actions of the pupil would be grounds for suspension, he or she shall conduct an informal hearing for the pupil

immediately after the alleged actions have occurred.... [6]

The pupil and his or her parent(s), guardian(s) or custodian(s), as the case may be, shall be given telephonic notice, if possible, of this informal hearing, which notice shall briefly state the grounds for suspension.

At the commencement of the informal hearing, the principal shall inquire of the pupil as to whether he or she admits or denies the charges. If the pupil does not admit the charges, he or she shall be given an explanation of the evidence possessed by the principal and an opportunity to present his or her version of the occurrence. At the conclusion of the hearing or upon the failure of the noticed student to appear, the principal may suspend the pupil for a maximum of ten school days, including the time prior to the hearing, if any, for which the pupil has been excluded from school.

W. Va.Code § 18A–5–1a (1996). So, in other words, if the principal hears that a student might have a weapon, and the principal believes this is a credible allegation, the principal phones the parents and has them come down to the school for a meeting with the principal and student. If the principal does not find the allegation credible, he or she need proceed no further.

If the principal does proceed, at this "principal's informal hearing," the principal is to make a "determination" as to whether or not the student violated the statute. Thus the principal becomes the finder of fact at this stage in the process. The Code permits the principal to make a "determination." At this point, should the principal determine that, for example, a student has found an abandoned gun and prudently turned it in to his or her teacher, the principal would be free to end the inquiry, and would be under no obligation to suspend the student.

However, if the principal determines that the student probably did violate the statute, then that principal has certain obligations under the Code:

(a) *A principal shall suspend* a pupil from school or from transportation to or from the school on any school bus *if the pupil, in the determination of the principal,* after an informal hearing pursuant to subsection (d) of this section, has: (i) Violated the provisions of ... subsection (b), section eleven-a, article seven, chapter sixty-one of this code; [by possessing a firearm on school property]

W. Va.Code § 18A–5–1a (1996) (emphasis added). So again, a principal must only suspend a student when, after hearing of the potential misconduct, the principal calls the parents, has an informal hearing and finds, *in the determination of the principal,* that the student has violated the code. If the principal determines that, for some reason, the student is not "guilty" of possessing a firearm on school property, the principal may end the proceedings. If the principal finds otherwise, the parties move on to the next step.

 In this case, J.M. argues that there is no evidence that his father received notice of the informal hearing, and that the hearing was somehow irregular and insufficient under the statute because the state trooper and prosecutor also attended. He also argues that nothing in the record shows that J.M. was notified of the possible grounds for his suspension, or that the principal inquired of J.M. as to whether he admitted or denied the charges. We find these arguments unpersuasive.

There is little question that J.M., after a trip to the state police barracks with his coach, would not realize that the informal hearing concerned the incident with the gun. His mother was notified and was present, and the record suggests that the father was aware of the proceedings as well. The addi-

---

**6.** The statute goes on to say that:

> The hearing shall be held before the pupil is suspended unless the principal believes that the continued presence of the pupil in the school poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process, in which case the pupil shall be suspended immediately and a hearing held as soon as practicable after the suspension.

W.Va.Code § 18A–5–1a(d) (1996).

tion of the police and prosecutor no doubt made the meeting more intimidating to J.M., but did not deny him the opportunity to give his side of the incident. Because the entire purpose of the hearing was to inquire as to what J.M. was doing with the gun, it would be incredible if the principal did not ask J.M. if he admitted or denied the charges. Thus we refuse to reverse on the basis of any of these alleged procedural deficiencies.

### 2. *Board of Education's Duties*

 As quoted above, if the principal determines that the student violated 61–7–11a (1996), then he or she must suspend the student, and turn the process over to the board of education. First the principal must report the suspension, in writing, to the parents of the student.[7] The principal must then notify the superintendent and must actually request, via the superintendent, that the board of education expel the student from school:

> If a student has been suspended pursuant to this subsection [subsection (a)], the principal shall, within twenty-four hours, request that the county superintendent recommend to the county board that the student be expelled. Upon such a request by a principal, the county superintendent shall recommend to the county board that the student be expelled. Upon such recommendation, the county board shall conduct a hearing in accordance with subsections (e) and (f) of this section to determine if the student committed the alleged viola-

tion. If the county board of education finds that the student did commit the alleged violation, the county board of education shall expel the student.

W. Va.Code § 18A–5–1a(a)(1996).[8]

Before the board can hold a hearing, the board must provide notice to the student and parents of the charges against the student and the time of the hearing. The hearing itself resembles a trial, in that the student may be represented by counsel and may present and examine witnesses. However, an important difference exists in that the board employs a preponderance of the evidence standard:

> (e) Prior to a hearing before the county board, the county board shall cause a written notice, which states the charges and the recommended disposition, to be served upon the pupil and his or her parent(s), guardian(s) or custodian(s), as the case may be. Such notice shall set forth a date and time at which such hearing shall be held, which date shall be within the ten-day period of suspension imposed by the principal.
>
> (f) The county board shall hold the scheduled hearing to determine if the pupil should be reinstated or should, or under the provisions of this section, must be expelled from school. At this hearing the pupil may be represented by counsel, may call his or her own witnesses to verify his or her version of the incident and may confront and cross-examine witnesses sup-

---

**7.** The principal shall report any suspension the same day it has been decided upon, in writing, to the parent(s), guardian(s) or custodian(s) of the pupil by certified mail, return receipt requested: Provided, That certified mail is not required if one or both of the parents, guardians, or custodians of the pupil are present at the time the suspension is decided upon, or if any one of them acknowledges receipt of the report by signing and dating a copy of the report. The suspension also shall be reported to the county superintendent and to the faculty senate of the school at the next meeting after the suspension.
W.Va.Code § 18A–5–1a (d) (1996).

**8.** J.M. argues that the letter of May 13, 1999, in which the principal notified the superintendent that J.M. had been suspended for ten days for "brining a loaded handgun on [school] premises," was inadequate because the principal did

not expressly ask the superintendent to recommend to the board that J.M. be expelled. We disagree. Written notification that J.M. had been suspended for having the gun on school property is equivalent to making that explicit request. If the principal had determined that J.M. actions did not violate the statute, the principal would not have suspended J.M. for the ten day period. Although the letter was not styled as a request for expulsion, its obvious purpose was to notify the superintendent of the action taken by the principal, so that the process could move on to the next step.

We also disagree with J.M.'s contention that the absence of a letter from the superintendent to the board recommending J.M.'s expulsion constitutes reversible error. It is clear that board conducted the expulsion hearing, and that the superintendent attended and advocated J.M.'s expulsion.

porting the charge against him or her. The hearing shall be recorded by mechanical means, unless recorded by a certified court reporter. The hearing may be postponed for good cause shown by the pupil but he or she shall remain under suspension until after the hearing. The state board may adopt other supplementary rules of procedure to be followed in these hearings. At the conclusion of the hearing the county board either shall order the pupil reinstated immediately or at the end of his or her initial suspension or shall suspend the pupil for a further designated number of days or shall expel the pupil from the public schools of such county. . . .

(i) In all hearings under this section, facts shall be found by a preponderance of the evidence.

W. Va.Code § 18A–5–1a(e), (f), (i) (1996).

Under this scheme, the board also acts as a finder of fact, and must come to its own conclusions about the actions of the alleged offender, but need not use the "beyond a reasonable doubt" standard that courts employ in regular, criminal proceedings. Just like the principal, the board has the authority to find that a student, even if he or she had a gun, did not violate the statute. Somewhat like a jury, the board listens to "the story" presented by the accused to explain why he or she had a weapon. If they believe it, then they are free to find that the student is not in violation.

■ Thus, we hold that, under W. Va. Code § 18A–5–1a (1996), both a principal and the members of a county board of education may examine the facts surrounding an alleged violation of the statute, at their respective hearings. Both principals, and members of the board of education have the authority, as finders of fact, to end expulsion proceedings, if either determines that a student has not violated the statute.[9]

Of course, if the members of the board find otherwise, however, they must expel the student, as quoted above.

(g) Pupils may be expelled pursuant to the provisions of this section for a period not to exceed one school year, except that if a pupil is determined to have violated the provisions of subsection (a) of this section the pupil shall be expelled for a period of not less than twelve consecutive months:

W. Va.Code § 18A–5–1a(g) (1996).

■ We find, however, that even after making such a determination, there is still an opportunity to reduce the punishment, if the situation warrants. When a county board of education expels a student for twelve months for a violation of W. Va.Code § 18A–5–1a (1996), the county superintendent of schools still has the power to reduce the student's punishment, if the superintendent finds it disproportionate to the student's actions. However, the superintendent must make a public record of this decision, and provide the reason for the reduction, as set forth in the statute:

Provided, That the county superintendent may lessen the mandatory period of twelve consecutive months for the expulsion of the pupil if the circumstances of the pupil's case demonstrably warrant. Upon the reduction of the period of expulsion, the county superintendent shall prepare a written statement setting forth the circumstances of the pupil's case which warrant the reduction of the period of expulsion. The county superintendent shall submit the statement to the county board, the principal, the faculty senate and the local school improvement council for the school from which the pupil was expelled.

W. Va.Code § 18A–5–1a(g) (1996). So in effect, a student who is found with a weapon at school has several opportunities for exoneration. The principal may find at the informal hearing that the situation is not a violation of the statute. The Board may find at the formal hearing that certain factors explain or excuse the student's conduct. Finally, the superintendent may, after the board hearing, reduce the period of expulsion if he or she feels that circumstances so warrant.[10]

---

**9.** We note that, pursuant to W. Va.Code § 18A–5–1b (1996), a county board of education may also choose to employ a hearing examiner to conduct the hearing we have described above.

**10.** Some might argue that the principal, the board, and the superintendent are actually going through the *malum in se* versus *malum prohibitum* inquiry that we discussed earlier. In es-

In this case, J.M. was afforded all of these protections. In each case, the fact finder determined that J.M.'s actions in having the gun tucked into his pants on school property constituted a violation of the statute. From the record we see that, even if the initial taking of the gun were defensible (which we question), J.M. had several opportunities to discard the gun or the bullets. While J.M.'s actions might be excusable to some, they were not to the principal, the board, nor the superintendent.

It may be that some of the school officials misunderstood their duty under the statute. It may also be significant that J.M.'s incident, of May 12, 1999, came just three weeks after the April 20, 1999 massacre at Columbine High school in Colorado, where two students murdered many of their classmates.[11] However, we do not feel it appropriate to undermine the authority of school officials, by rejecting the factual findings of those closest to the events in this case.[12]

## IV.

### CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Webster County is affirmed.

Affirmed.

STARCHER, Justice, concurring in part, and dissenting in part.

(Filed July 20, 2000)

The majority opinion sets forth equitably compelling facts, and does a good job in crafting excellent syllabus points. Then it applies the good facts to the good law, and ends up with a bad result. There is only one explanation for such a result—the wish of the majority not to "undermine" a local school board that is bent on "zero-tolerance," regardless of the equities and the law.

Last year, I had the honor to attend a community forum on school violence sponsored by Senator Robert Byrd at West Virginia University. At that forum, we learned from expert after expert—and from our own state's teachers—that an inflexible zero-tolerance policy is counter-productive.

What we heard is well summarized in a recent article from the *ABA Journal* that I include as an appendix. I am glad to have the law that the majority has propounded. I wish that the majority had applied the law of this case to the facts of this case. And I am sorry that J.M. must suffer because this Court was unwilling to right the wrong of the Webster County Board of Education.

Accordingly, I concur in the syllabus of the majority opinion, but I dissent to the opinion's conclusion.

### APPENDIX

### ZERO TOLERANCE, ZERO SENSE

School violence is a hot-button issue, but are strict, inflexible policies the answer? Some say yes, while others insist that all-or-nothing punishments merely alienate students.

---

sence, the administrators are conducting a similar analysis; they examine the facts of a given case and then compare those facts with what they know about the world, and the behavior of students. But we are not inclined to straight jacket these administrators by reading into the statute a requirement that they must counter every possible common law defense to the crime of possession before deciding that a student has violated, or not violated, the Safe Schools Act. It is important that the administrators realize that they are not wedded to either extreme.

11. We hasten to point out that we have no desire to promote a culture of fear and mistrust in our schools, or the so-called "Columbine Effect," where students are expelled or suspended for petty infractions. *See* John Cloud, *The Colum-*

*bine Effect*, Time, December 6, 1999. West Virginia is blessed with an historically low crime rate, and Webster County, where most citizens know one another, is especially fortunate in that regard. Proper student discipline is more of an art than a science, and that is why it is important to give principals and local board members the discretion *not to expel*, as well as expel, when a student's actions so warrant.

12. We are also mindful of the continuing harm an expulsion can have on a student's future, and we do not mean to equate J.M.'s behavior with that of truly disturbed students who have harmed their classmates. Indeed we hope that now that his expulsion has run its course, that he enjoy a successful high-school, and later college, career.

BY MARGARET GRAHAM TEBO

Six-year-olds carrying weapons, seventh-graders trafficking in drugs, high schoolers making terrorist threats.

A quick glance at the headlines these days might lead one to think that American public schools have become dangerous, violent places. In reality, the stories behind those headlines sometimes yield less-than-disturbing facts.

The "weapon" brought by the six-year-old was a plastic knife in his lunch sack, put there by a grandmother who wanted him to be able to spread his peanut butter. The "drugs" traded by the seventh-graders were Midol tablets. The "terrorist threat" by the high schooler was an ill-conceived campaign poster for a student council candidate that attempted to parody the movie *Speed.*

Nationwide, statistics gathered by the Justice Policy Institute and the U.S. Department of Education show that crime of all sorts is down at public schools since 1990—some studies say by as much as 30 percent. Less than 1 percent of all violent incidents involving adolescents occur on school grounds. Indeed, a child is three times more likely to be struck by lightning than to be killed violently at school.

Still, fueled by media hype, fear of the unthinkable and perhaps even a bit of guilt, more parents are demanding that school boards implement strict policies to deal with kids who step out of line.

So-called zero-tolerance policies being implemented across the country are snaring large numbers of regular kids in broad nets designed to fish for troublemakers.

No current statistics are available on the number of public school students who are are formally disciplined or prosecuted for wrongdoing. But an informal discussion recently during a seminar for attorneys who represent children showed a sharp increase in the number of clients seeking counsel over perceived injustices in school discipline.

The seminar, sponsored by the ABA Juvenile Justice Center, included a program on school officials' extreme and even bizarre reactions to student misbehavior in the wake of the Columbine shootings. Examples cited included the plastic knife and Midol cases.

"I was overwhelmed by the response from attorneys from across the country who were experiencing a new wave of these cases," said Kim Brooks, executive director of the Children's Law Center of Kentucky, who spoke at the seminar. "Our office has been inundated with these, too. It's gone in cycles, after a major incident that gets significant media coverage."

Deepening Chasm

Kids whose misbehaviors in the past would have occasioned oral reprimands from a teacher or perhaps a trip to the principal's office are now being labeled a threat to school safety. And, those very same kids-will-be-kids incidents are now prompting punishments ranging from suspension to expulsion to referral to the juvenile court system for behaviors that even the schools agree do not actually compromise safety.

The result is a growing alienation between the administrators who implement the policies and the kids they are trying to protect.

"Zero tolerance does away with the entire concept of innocent until proven guilty," says Catherine Krebs, an attorney with the Children's Law Center in Boston. "Our job as adults is to help kids learn from their mistakes, not to throw them out of school and say, 'That's the end of it.'" Krebs notes that in Massachusetts, students expelled from public school lose their right to a public education permanently.

What becomes of kids of whom the system washes its hands? Many turn to gangs and crime, since without a high school diploma, legitimate jobs are nearly impossible to get. And even kids who have rarely been in trouble before their run-in with zero tolerance seem to be getting a message that mistakes of youth will not be tolerated and second chances are rare.

"The message that kids are getting is, 'Our main enemy is among us and it is our children,'" says Bernardine Dohrn, director of the Children and Family Justice Center at Northwestern University School of Law.

"Our whole goal should be to hold onto them until they grow out of it, not look for more and more ways to get rid of kids."

But helping kids to learn from mistakes often takes a back seat to law-and-order concerns. And, say some lawyers, psychologists and parents, the harshness of the penalties for seemingly innocuous offenses is often fueled less by genuine safety concerns and more by fear of lawsuits from those who might allege unequal treatment.

"Schools are confusing equal treatment with equitable treatment," says Dohrn. "Kids in middle school and high school care most about fairness. When they see two students whose 'offenses' are vastly different being treated exactly the same, that sense of fairness is obliterated and replaced with fear and alienation."

We expect kids to learn to make differentiations of degree on various types of matters in their school work, points out Diane Fener, a private lawyer in Virginia who represents children. And children are able to understand that there is a difference between being treated equally and being treated fairly.

"Kids are not going to respect teachers and administrators who cannot appreciate the difference between a plastic knife and a switchblade," says Fener.

And the idea that treating everyone the same will protect the school from lawsuits may prove to be misguided as well. Some parents who believe that their children were treated too harshly as a result of all-or-nothing policies have considered lawsuits to attempt to restore their children's reputations.

Still, in the few cases across the country in which parents have tried to challenge a school board's decisions regarding expulsion, courts have consistently found that such decisions are a matter for the board's discretion.

The only requirement appears to be minimal due process, which the courts have found can be satisfied by merely holding a hearing at which the student and parents are given an opportunity to speak.

Except in cases where the student has been shown to be covered by the Americans With Disabilities Act, courts have appeared extremely reluctant to invade the territory of school authorities to make disciplinary decisions.

Board Oversteps Bounds

One exception is a 1999 Pennsylvania case in which the court found that the school board exceeded its authority in adopting a zero-tolerance policy that resulted in the expulsion of a seventh-grader for possession of a Swiss Army knife. The court said that under Pennsylvania law, the superintendent of each school district is vested with discretionary power to overturn expulsion decisions based on the individual facts of the case.

By adopting a zero-tolerance policy that denied the superintendent the ability to review the expulsion decision, the school board exceeded its authority, the court said in overturning the expulsion. *Lyons v. Penn Hills School District,* 723 A.2d 1073 (Pa.Cmwlth. 1999).

One family that considered a lawsuit, but rejected the notion because their attorney said it was unwinnable, is the Heitners of suburban Cincinnati. Eighteen-year-old Dana Heitner was the leading candidate to be valedictorian of his class at Madeira High School last fall. Then the straight-A student decided to make some campaign posters for his girlfriend's run for student council.

One of the posters was intended to be a spoof of the movie *Speed,* in which a bus is rigged so that once driven above 50 mph, the bus will explode if the speed drops below that threshold. The bomber demands a ransom to deactivate the bomb, to be delivered to a certain doctored receptacle near a subway station. Heitner made a hand-lettered black and white campaign sign and hung it in a stall in the boys' washroom at the school. The sign read:

"There is a bomb in this receptacle. If the weight on the seat goes over 50 pounds, the bomb will be activated. Once activated, this receptacle will blow up if the weight put upon it ever goes below 50 pounds. The only way to get off the seat safely is to scream as loud

as you can that you will vote for Robin Cox in the coming election and then deposit one billion dollars in the nearest mail container with a hole in the bottom that connects the container to a not yet completed underground subway."

When school officials learned that the poster was made by Heitner, they knew that no genuine threat was intended, according to Michele Hummel, superintendent of the Madeira City Schools. Officials quickly decided that no evacuation of the school was necessary, and the majority of students were never even aware of the incident.

However, Heitner and Cox were both charged by the school board with making terroristic threats—a finding that carries a mandatory suspension penalty under the school's zero-tolerance policy.

"Under state law, every district in Ohio is required to have a zero-tolerance policy and to employ it without exception," says Hummel. "Dana knew or should have realized that this was not a smart thing to do."

Heitner and Cox were both suspended from school for 10 days. Neither was allowed to receive credit for any schoolwork assigned during their suspension. As a result, Heitner's grades for the first quarter dropped significantly. In calculus, normally one of his best classes, he received a D because he missed an exam during the suspension.

As a result of the grade drop, he now expects that he will lose his valedictory status come graduation in June. In addition, he was required to disclose on some of his college applications whether he had ever been suspended from school. He is uncertain whether his truthful answer will prevent his admission to some colleges.

Heitner and his parents say they don't understand why a disciplinary incident should be allowed to have an impact on his grades.

"I still don't think it was any big deal," Heitner says. "But if I had to be punished, make me write an essay or do some community service. Why change the grades I earned to reflect something other than reali-

ty? I am not a D student in calculus. I aced every assignment."

But Hummel says the policies are only effective when things that are highly valued—such as grades—are at stake, and that anything less would not be a deterrent. In addition, she says, Heitner was not denied any learning opportunities because he was required to complete the assignments that he missed, and was allowed to consult with his teachers about class lectures he did not attend.

"I would personally be happy to write a letter of recommendation on behalf of Dana's admission to any college or university," says Hummel. "But rules are rules, and he knew better."

Heitner counters that he did not consider his sign to be a threat, and had no idea at the time that others would see it as a violation of the rules.

The superintendent's acknowledgment that Heitner's poster was never considered a bona fide threat raises the question of just what zero tolerance is designed to protect, or promote.

## Underlying Problems Overlooked

Parents tend to think of zero tolerance as keeping guns and drugs out of their schools and away from their kids. But that assumption fails to acknowledge the obvious: Kids such as the shooters in Littleton, Colo., Paducah, Ky., and Springfield, Ore., would not have been deterred from their shooting sprees by the existence of a zero-tolerance policy. Indeed, even before the term was coined, virtually every school already had a strict policy that prohibited weapons on school property.

Rather than safeguarding the good kids from the bad, zero tolerance seems to be a convenient catchphrase for schools unable or unwilling to prevent school violence by identifying and counseling at-risk students before they turn violent. All of the recent school shooters showed some signs of either repeated violent fantasies or of detectable mental illness months before their crimes, and yet they scarcely received even rudimentary evaluation or counseling.

And, under zero-tolerance initiatives, some students are less inclined to confide in teachers or school counselors for themselves or friends who may need intervention, out of fear that they will be punished rather than helped, says Irwin Hyman, a professor of school psychology and director of the National Center for Corporal Punishment and Alternatives at Temple University.

Such was apparently the case with a middle-school student in Virginia recently, who talked a suicidal classmate into relinquishing a knife that she planned to use to kill herself. Rather than turning the knife over to school officials, the boy kept it in his locker, planning, he said later, to give it to his mother or to the girl's family.

Instead, when the knife was found in his locker, he was suspended for possessing a weapon on school grounds. The boy later told a television reporter that he was afraid his friend would be in trouble if he turned in the knife, and he wanted her to get counseling, not punishment.

And there are dozens of similar stories played out on the nightly news across the country. A second-grader who accidentally grabbed her mother's lunch bag containing a steak knife was disciplined despite turning the bag over to her teacher as soon as she realized her mistake. A middle-schooler who shared her asthma inhaler on the school bus with a classmate experiencing a wheezing attack was suspended for drug trafficking. An eighth-grader was handed over to juvenile authorities for allegedly making an off-color joke about the Columbine incident to a classmate. The student spent 26 days on home confinement.

But when employed with common sense, zero-tolerance programs can improve school systems, says Celia Lose, assistant director of public affairs for the American Federation of Teachers, the largest teachers' union in the country.

"We are very supportive of zero tolerance for violent offenses—guns, drugs and the like," says Lose. "But when schools start trying to use zero tolerance to enforce all sorts of discipline issues, such as tardiness or possession of baby aspirin, the message gets lost."

Zero tolerance has had a positive effect, though, in that it has spurred school districts to clarify and communicate their policies for weapon and illegal-drug offenses. Before, the punishments were not always clear, according to Lose. Many school districts either had no written policy or had policies that simply said certain items were banned, but failed to put students on notice of the punishment. Consequently, enforcement was spotty and inconsistent.

Now, says Lose, a student has a very clear message that items such as Boy Scout knives are not to be brought to school, even if needed for a Scout meeting later in the day. Still, schools need to take motives into consideration when determining punishments. In court, judges generally consider whether a legal violation is inadvertent or intentional when determining the severity of the sentence to be meted out. A solid zero-tolerance policy must also make the severity of the punishment fit the offense, Lose says.

"School is really the safest place a kid can be," she says. "We have a responsibility to make it as safe as it can be. But zero tolerance can't mean zero common sense."

### Three-tiered Approach

Texas is one state with an innovative approach to zero tolerance. There, legislation sets out three levels of violations and the appropriate responses, says John Cole, president of the Texas Federation of Teachers. At the most serious level are four offenses that merit expulsion: bringing a gun, bringing a knife with a blade long enough to reach the heart, bringing drugs the nature and amount of which would constitute a felony, and aggravated assault. Students expelled for these reasons are required to attend a county alternative school.

At the second level, offenses including simple assault, misdemeanor drug possession, use of alcohol and a few other violations net the student a temporary removal from school. Students are required by state law to attend an alternative education setting in their own

school district and are required to complete their normal school work.

At the lowest level are offenses for which school officials have discretion to determine the severity of the offense and the punishment.

But some educators say they are already overburdened with the social problems that students bring to school, and to charge them with determining which incidents pose genuine threats and which do not is beyond the realm of their capabilities. At least some juvenile law experts agree.

Krebs, of the Children's Law Center, advocates referrals of questionable student incidents to independent decision-makers, generally psychologists or others trained to deal with adolescent behavior. Hyman agrees that more psychological services are needed. But where would the money come from?

"We're turning our schools into a police state. Use some of the funds that are going for police officers, cameras and all of that," says Hyman.

And, get students themselves involved, says Dohrn of Northwestern University. Peer-review panels are particularly effective for transgressions such as technical violations of school policy, she says. That way, the students themselves can investigate the complexities of the situation and devise solutions.

Dohrn cites two basic principles that she believes are key to stemming violence and reversing the trend toward overzealous punishment in schools: No child should be deprived of an education, and all school disciplinary measures must be fair, equitable and individualized.

Among her recommendations:

* Create high-quality alternative schools to accommodate students who must be expelled.

* Keep schools open until 6 p.m. for extracurricular programming.

* Use peer juries to hear disciplinary cases.

* Set up smaller schools where all students are known to adults in charge. (This has been accomplished even in some large urban areas simply by breaking large high schools into smaller units.)

* Remove guns from children's environments.

In Florida, a pilot program guarantees confidentiality to any student who approaches a counselor with concerns about safety or a potential violation of school policy. Students are promised that investigations will seek to provide help to those in need first, with discipline used as a last resort.

"Insurance companies do seminars for employers about how to identify and avoid problems at work. We should be doing the same for people who deal with kids," says children's lawyer Fener. "We know what works. Let's put the emphasis—and the money—there."

*Margaret Graham Tebo is a legal affairs reporter for the* ABA Journal.