619 S.E.2d 274

**Barbara COBB, Respondent Below, Appellant,**

v.

**WEST VIRGINIA HUMAN RIGHTS COMMISSION and Beverly Wattie on behalf of Krystal Wattie, Complainants Below, Appellees.**

**No. 31854.**

Supreme Court of Appeals of West Virginia.

Submitted April 5, 2005.

Decided July 8, 2005.

Dissenting Opinion of Justice Starcher July 14, 2005.

James M. Haviland, Robert J. Smith, Pyles Haviland Turner & Smith, L.L.P., Charleston, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Paul R. Sheridan, Deputy Attorney General, for Appellee.

BENJAMIN, Justice.

This is an appeal of the West Virginia Human Rights Commission's January 30, 2004 Final Order which adopted an Administrative Law Judge's Final Decision dated August 26, 2003 in its entirety. Upon extensive review of the record before the West Virginia Human Rights Commission ("HRC"), together with the briefs and argument of counsel, we reverse the HRC's January 30, 2004 Final Order for the reasons set forth below.

**I.**

## FACTS AND PROCEDURAL HISTORY

In April 2001, Beverly Wattie filed a complaint[1] with the HRC on behalf of her daughter, Krystal Wattie[2], a student at Riverside High School in Kanawha County, West Virginia at all times relevant, against several parties, including the Appellant Barbara Cobb, a teacher at Riverside High School. An amended complaint was filed on September 20, 2001 asserting claims of racial harassment and reprisal. The amended complaint alleges that, on or about December 5, 2000, prior to and continuing, Krystal Wattie, an African American child, was harassed by her English teacher, Ms. Cobb, due to her race; that Ms. Cobb continued to engage in racial harassment after being instructed not to address Krystal Wattie in October 2000; that, on December 6, 2000, Ms. Cobb informed Krystal Wattie she would have Krystal expelled from school, "get her" and "the fight was not over"; that Ms. Cobb insisted Krystal Wattie be removed from her class during the Fall semester of 1999, a move to which Beverly Wattie objected; and that Ms. Cobb falsely accused Krystal Wattie of not doing her summer reading assignment as an act of reprisal. The amended complaint also included harassment allegations against another teacher and allegations of failure to rectify a racially hostile environment against the Kanawha County Board of Education, Riverside High School and Principal Richard Clendenin.[3]

After certain discovery, a public hearing was commenced before an Administrative Law Judge on January 14, 2003. The hearing continued on January 15, 2003 and was concluded by the taking of testimony on February 25, 2003. Testimony was taken from

1. The April 2001 complaint was not included in the record forwarded to this Court by the HRC.

2. Krystal Wattie was a minor at the time the original complaint was filed and had reached the age of majority by the time of the administrative hearings in this matter. Although this Court will often use initials to identify minor parties where sensitive issues are involved, *see, e.g., In re Stephen Tyler R.*, 213 W.Va. 725, 729, 584 S.E.2d 581, fn. 1 (2003), Krystal Wattie was an adult at the time of the administrative hearings, is a party in interest in this litigation and has been identi- fied by name by counsel in the filings before this Court and during oral argument. We therefore identify her by name. However, to the extent this Court references testimony by or regarding other students at Riverside High School who are not parties to this action, we will identify those students by initials only in order to protect their identity.

3. The allegations against these parties were resolved prior to the commencement of the administrative hearings in this matter and the claims dismissed.

Krystal Wattie, Beverly Wattie, Barbara Cobb, Principal Richard Clendenin, several teachers and administrators at Riverside High School during the time in question and a Riverside Student, P.B., who was in Ms. Cobb's class and was Krystal's friend. The testimony provided by these witnesses reveals the following facts.

Riverside High School opened in Kanawha County, West Virginia in 1999, before the 1999–2000 school year began. Appellant Barbara Cobb was a teacher at Riverside High School, teaching Spanish and 9th Grade English classes that year. Krystal began her 9th Grade year at Riverside High School in Fall 1999 when the school opened. Krystal was placed as a student in Ms. Cobb's second semester, first block, 9th Grade English class which began in January, 2000.[4] Krystal admits that she was often late to Ms. Cobb's class and alleges that Ms. Cobb would then lock her out of the classroom.[5] There is also evidence that Krystal would talk during class and otherwise be disruptive to the educational process. Krystal also alleges that Ms. Cobb would confuse her with her friend, A.W., another African American student in the class. There appears to have been issues with both Krystal's and A.W.'s conduct in Ms. Cobb's class and in the hallways of Riverside High School, including tardiness, talking in class, noise and general disruptiveness. Two meetings were held between administrators, Ms. Cobb, Krystal and Beverly Wattie regarding the classroom issues. During the first meeting, Ms. Cobb indicated that her problems with Krystal in class centered upon Krystal's tardiness and rudeness—she expected Krystal to come to class on time, not disrupt class and be prepared. Beverly Wattie agreed that those expectations were fair.

During the second meeting, it appears that problems were still occurring, although the conduct had "improved." Krystal admits stating race was not an issue during these meetings. Principal Clendenin testified that Krystal admitted during one of the meetings that the problems, i.e., her behavior in class, were because she did not like Ms. Cobb and that race was not mentioned until the end of the 2000–2001 school year. The problems apparently continued and, eventually, both Krystal and A.W. were given the option of being transferred from Ms. Cobb's class. A.W. accepted the transfer, Krystal chose to remain in Ms. Cobb's class.

During Krystal's time in Ms. Cobb's 9th Grade English class, an incident occurred on or about March 22, 2000, in the school's library regarding the turning in of class notebooks for grading. Prior to leaving Ms. Cobb's classroom to go to the library, Ms. Cobb informed the class that they could turn in their notebooks to be graded for extra credit. Not having their notebooks with them, Krystal and P.B. went to their lockers before continuing on to the library. According to Krystal, the incident began when she asked Ms. Cobb for a copy of the syllabus (or rubric) that she was using to grade so she could get her notebook ready.[6] The incident continued with voices being raised and Krystal leaving the library. Ms. Cobb and Krystal's friend, P.B., stated that Krystal's departure from the library was without permission. Krystal maintains she was told to go to the office.[7] Krystal received two days ALC[8] from the administration as discipline for this incident.

Krystal also maintains that Ms. Cobb denied receiving Krystal's summer reading as-

4. Although the September 2001 amended complaint alleges that Krystal Wattie was a student in Ms. Cobb's Fall 1999 9th Grade English Class, the record, including the testimony of both Krystal Wattie and Beverly Wattie is clear. Krystal Wattie was not in Ms. Cobb's English class until the second (Spring) semester.

5. The facts related herein are done so in the light most favorable to Appellees and, to the extent possible, are based upon the testimony of Krystal and Beverly Wattie. Facts ascertained from testimony of other witnesses are noted as such.

6. P.B., another student in the class, admitted that a syllabus was given at the beginning of the semester to show how the notebooks were to be kept during the semester. Ms. Cobb stated that notebooks were required to be kept current on a daily basis.

7. No one supported Krystal's version of her departure, according to the record.

8. ALC is a form of in school suspension. There is a suggestion on the record that Krystal did not serve both days of the imposed discipline.

signment resulting in Krystal not receiving a grade for the same.[9] Krystal maintains the assignment was timely turned in. Ms. Cobb maintains there is no record that it was ever turned in. Krystal also alleges that Ms. Cobb frequently sent her to the office from class, that Ms. Cobb would respond to her questions in class by stating it was not the right time to ask, and that Ms. Cobb would refuse to give her make-up work after an absence without the intervention of an administrator. Ms. Cobb remained Krystal's 9th Grade English teacher until late March 2000, when Ms. Cobb took leave to undergo cancer treatment.

The record also indicates that Riverside High School was experiencing problems with excessive noise in hallways during its first few years. The excessive noise complaints centered primarily upon a group of students which included Krystal. This included complaints of students in halls during Jump Start[10] and classes. The excessive noise in the hallways was primarily being experienced in the hallway where both Ms. Cobb's classroom and Krystal's locker were located. It appears the administration tried to address this problem with increased faculty presence and monitoring in the hallways. It also appears that the group of students, including Krystal, were given a "talk" by members of Riverside High School's administration regarding proper conduct.

Ms. Cobb returned to Riverside in Fall 2000 at the beginning of the 2000–2001 school year. Krystal was not a student in any of Ms. Cobb's classes at this time. However, her locker remained near Ms. Cobb's classroom door. The record reveals that problems between the two continued, particularly in the hallway near Ms. Cobb's classroom. The record reveals several incidents occurring during the Fall 2000 semester, some of which were witnessed by other teachers or administrators. These incidents included Krystal and her friends making comments to the affect of "just let her say something" when Ms. Cobb would pass. In addition, at times, Krystal and her friends virtually blocked Ms. Cobb's path in the hallway. One incident resulted in Ms. Hopkins, another teacher, taking Krystal away from a confrontation with Ms. Cobb and counseling Krystal not to have a conversation with Ms. Cobb outside the presence of an administrator. There is conflicting evidence on the record as to how the confrontation began, whether Krystal approached Ms. Cobb or vice versa. However, it appears the discussion included Krystal inquiring about Ms. Cobb's "talking about" her. It is undisputed that after Ms. Hopkins took Krystal away, Ms. Cobb approached the two and stated something to the effect that it was a good thing Ms. Hopkins came along when she did because she (Ms. Cobb) did not know what would have happened.

One of the primary hallway incidents occurred on or about October 11, 2000, during the Jump Start period when Ms. Cobb noticed several students at their lockers and instructed them to go to Jump Start.[11] Krystal was one of the students at her locker at that time and admitted to ignoring Ms. Cobb's instruction to get out of her locker and move on to class. When Krystal finally exited her locker and started toward class, Ms. Cobb inquired as to why she had not listened when instructed to get out of her locker. Krystal's notes regarding this incident indicate that she did not get out because she was not finished and that she inquired of Ms. Cobb why she (Ms. Cobb) did not say anything to anyone else in the hallway at the time. Ms. Cobb asserts that Krystal approached her after leaving the locker, asked "why are you like this, you always got to say

9. Summer reading assignments were to be completed by incoming 9th Grade students during the Summer of 1999. Students whose 9th Grade English classes did not begin until the second (Spring) semester were not required to turn in their summer reading assignments until the start of the second (Spring) semester.

10. Jump Start is a short period of time before the start of regular classes when students are permitted to catch up on assignments or speak to teachers regarding class work. Students are not assigned a particular class room for Jump Start, but are permitted to go to any teacher's class room.

11. Ms. Cobb testified that she said something only after hearing another teacher instruct the students to get out of their lockers several times without a response.

something," made several other comments and "flailed" her fingers in Ms. Cobb's face. Krystal testified that she (Krystal) said "come on, let's go, I'm going to the office." Krystal and her friend, M.A., then proceeded to the office, followed by Ms. Cobb. On the way to the office, Krystal, M.A., and Ms. Cobb passed a classroom where Krystal's mother, Beverly Wattie, was holding an Upward Bound meeting. Krystal and Beverly Wattie testified that Ms. Cobb asked Beverly Wattie if she was going to let her daughter (Krystal) treat her (Ms. Cobb) like this.[12] Upon arriving at the school office, Krystal remained with administrators and Ms. Cobb was instructed to return to her first block class. After completing her Upward Bound meeting, Beverly Wattie joined her daughter in the school office and then together proceeded to Ms. Cobb's classroom.

During class instruction time, Beverly Wattie entered Ms. Cobb's classroom and crossed the room to her desk, where Ms. Cobb was seated and taking roll. Though the parties related somewhat inconsistent details, it appears that Beverly Wattie requested to talk with Ms. Cobb or to schedule a meeting (presumably during Ms. Cobb's planning time). Ms. Cobb indicated that any meeting would need to be during her planning time. Although Krystal denies saying anything to Ms. Cobb during this time, Beverly Wattie admits her daughter said something and that she was told to stop by her mother. Ms. Cobb alleges both Krystal and Beverly Wattie were making derogatory remarks about Ms. Cobb in front of the class, including calling her a two-year old and that she was acting like a student. It is also undisputed that Ms. Cobb called the office twice during this time to have the Watties removed from her classroom. The administrator who responded informed Beverly Wattie that she should not deal "unprofessionally" like this and that she could not enter teachers' classrooms during class time.[13] At the direction of Ms. Cobb, her students recorded what they had witnessed.[14]

Another incident occurred involving Krystal Wattie, Beverly Wattie and Ms. Cobb outside Ms. Cobb's classroom on or about December 5, 2000. According to Ms. Cobb, she heard noise in the hall during class, looked out and saw the Watties. She claims to have closed the door and, a short time later saw Beverly Wattie through the small window in her door. She then claims to have opened the door and asked Beverly Wattie if she could help her. She claims Ms. Wattie responded by instructing her to go back to class and teach, that it was not her (Ms. Cobb's) concern what she (Beverly Wattie) was doing. Ms. Cobb noted that Beverly Wattie was not wearing a visitor's pass. Ms. Cobb claims to have returned to the classroom and called the office regarding a parent peering in her classroom and making remarks to her. She also admits to returning to the hallway where "heated words" were exchanged. According to Beverly Wattie, the incident occurred as she was walking down the hallway by herself when Ms. Cobb came out of the classroom and confronted her regarding not wearing a visitor's pass. Beverly Wattie testified that Ms. Cobb told her that teachers had told her (Ms. Cobb) what Beverly Wattie had said about Ms. Cobb to other teachers. Beverly Wattie admits telling Ms. Cobb to go back in her classroom and teach and to stop acting like a two-year old. Ms. Wattie also testified that an administrator, Ms. Switzer, came down the hall and tried to "coax" Ms. Cobb back into her classroom. Ms. Switzer, called as a witness by the Commission, testified to recalling little regarding the incident. According to Ms. Switzer, Ms. Cobb may have been in her room at the time Switzer arrived.[15]

---

12. Beverly Wattie testified she was standing near the door to the classroom when Ms. Cobb passed and made this comment.

13. Mr. Clendenin also testified that after the incident he instructed Beverly Wattie not to go into teachers' classrooms unannounced and disrupt the educational process after this incident.

14. The notes authored by the students support Ms. Cobb's version of events.

15. Specifically, Ms. Switzer testified:

Q: Do you remember Ms. Cobb being there?
A: I don't know whether she stayed in her room or if she came out in the hall, I'm not sure.

While the majority of incidents occurred during the Fall 2000 semester, the most serious incident occurred on March 31, 2001 during a school play. Both Ms. Cobb and Krystal were in attendance at the school play being held in Riverside High School's auditorium on March 31, 2001. During the second intermission, Ms. Cobb went to an empty ladies room. While Ms. Cobb was in a stall, Krystal entered the restroom while talking on her cell phone. Krystal and Ms. Cobb's versions of what occurred next are somewhat divergent. According to Ms. Cobb, she waited to see if Krystal would leave before exiting the stall. When Krystal did not leave, Ms. Cobb exited the stall and proceeded to the sink area to wash her hands. According to Ms. Cobb, she was edged toward the sink furthest from the door by Krystal's movements as Ms. Cobb was attempting to avoid contact with Krystal. After washing and drying her hands, Ms. Cobb testified that Krystal accused her of coming too close to her (Krystal) as Ms. Cobb was attempting to exit the ladies room. Ms. Cobb testified she initially ignored the comment and Krystal continued screaming her name, asking why she was not answering her (Krystal), and making comments regarding Ms. Cobb's age. According to Ms. Cobb, she responded to Krystal's comments by stating "I just came in here to use the bathroom, that's all." Ms. Cobb testified that she asked two students who had entered the restroom to go get help.

According to Krystal, Ms. Cobb left the stall, washed her hands and bumped into Krystal as she went to dry her hands. Krystal testified that Ms. Cobb did not respond when Krystal asked her "why did you touch me with all this room in this restroom." According to Krystal, Ms. Cobb did not immediately respond, but dried her hands before saying "you're (Krystal) not always right." At that point, Krystal states they got into an argument. Krystal admits asking Ms. Cobb why Ms. Cobb had a grudge against her. According to Krystal, Ms. Cobb responded that she did not hold a grudge, that "you (Krystal) just always think you're right and who do you think you are." Krystal then stated two girls came in and Ms. Cobb asked them to go get help.

Both agree that after Ms. Cobb asked the girls to get help, Jacqueline Switzer, a Riverside High School administrator, came into the restroom. Upon Ms. Switzer's arrival, Ms. Cobb told Ms. Switzer what had occurred. According to Krystal, while Ms. Switzer was present and listening to Ms. Cobb, Ms. Cobb was also physically "throwing her body all on me," pushing Krystal backwards. Krystal also stated that Ms. Cobb accused Krystal of hitting her (Ms. Cobb). According to Ms. Cobb, Krystal "shouldered" her while she was telling Ms. Switzer how Krystal had tried to block her passage to leave the restroom. Ms. Cobb also testified that Ms. Switzer acknowledged witnessing Krystal "shoulder" Ms. Cobb in the restroom. In her testimony and report[16] regarding the incident, Ms. Switzer relates that when she entered the restroom, both Krystal and Ms. Cobb were shouting. Ms. Cobb then "reenacted" what had happened for Switzer. Ms. Switzer's report and testimony are contradictory about whether physical contact[17] did take place during the "reenactment." A second teacher, Rebecca Burch, testified to entering the restroom after hearing screaming. Ms. Burch testified that she saw Krystal pushing Ms. Cobb with her shoulder. After the "shouldering" incident, Ms. Cobb left the restroom and called police to report an assault. Ms. Switzer then took Krystal to the gym. Ms. Switzer did not allow police to speak to Krystal that evening.

It appears from the record that Krystal was assigned an escort to walk with her between classes after this incident.[18] Vari-

---

16. Ms. Switzer's report, dated April 5, 2000, references a March 31, 2000 incident. However, the dates appear to be typographical errors as the record indicates this incident occurred in 2001.

17. Ms. Switzer testified that she did not recall physical contact. However, in her report, she indicates physical contact occurred during the re-enactment, but it was not "intentional."

18. The record is not entirely clear as to when this escort was assigned. This Court's review of the record indicates that the escort likely began in April 2001, as this was the first mention of an escort in various notes authored by Ms. Cobb. These notes, which were entered into evidence

ous other incidents, too numerous to discuss in detail herein, were related in the record. However, testimony regarding the above incidents was provided in detail and provides a good overview of the situation underlying the present action. After taking testimony and considering briefs submitted by the parties, the Administrative Law Judge made findings and entered a Final Decision on August 23, 2003, which found Ms. Cobb had discriminated against Krystal on the basis of race, awarded Krystal $500.00 in damages and assessed $1,426.31 in costs incurred by the HRC in prosecuting the claims against Ms. Cobb. Ms. Cobb appealed the August 23, 2003 Final Decision to the HRC. The HRC affirmed the Administrative Law Judge's findings and adopted the same as its own by Final Order dated January 30, 2004. We accepted Ms. Cobb's appeal of the HRC's Final Order by Order dated September 2, 2004.

## II.

## STANDARD OF REVIEW

■ The instant appeal may properly be characterized as challenging the HRC's findings of fact, application of law to facts and conclusions of law. Pursuant to W. Va.Code § 5–11–11 (1989), appeals from an order issued by the HRC may be brought directly to this Court, instead of first being reviewed by the circuit court pursuant to W. Va.Code § 29A–5–4 (1998).[19] Where an appellant exercises the statutory option to by-pass the circuit court and directly appeal a HRC Order to this Court, we have generally applied the same standards of review as those required to be applied by the circuit court in an administrative appeal while not specifically holding that the same are applicable. Therefore, we now hold that where an appeal from an Order issued by the West Virginia Human Rights Commission is brought directly to this

without limitation or objection as exhibits by the HRC, indicate that Krystal, in April 2001, "now" has an escort. Principal Clendenin testified that the escort may have begun before the restroom incident and that he saw the escort as a protective measure for both parties.

19. W. Va.Code § 5–11–10 (1994) specifies that all pertinent provisions of W. Va.Code § 29A–5–1

Court, pursuant to W. Va.Code § 5–11–11 (1989), this Court will apply the same standard of review that is applied to Human Rights Commission orders appealed to a circuit court. Thus, upon review, "this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, in part, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996). *See also Smith v. West Virginia Human Rights Comm'n,* 216 W.Va. 2, 602 S.E.2d 445, 449 (2004) (same). We have also noted that an administrative law judge's application of law to the facts is reviewed *de novo. See Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) (involving appeal taken from West Virginia Employees Grievance Board and noting similarity between standards of review applicable to decisions under W. Va.Code § 18–29–7 (Employees Grievance Board) and W. Va.Code § 29A–5–4(g) (Administrative Procedures Act)). " 'West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties.' Syllabus Point 1, *West Virginia Human Rights Comm'n v. United Transp. Union, Local No. 655,* 167 W.Va. 282, 280 S.E.2d 653 (1981)." Syllabus Point 2, *Smith v. West Virginia Human Rights Commission,* 216 W.Va. 2, 602 S.E.2d 445 (2004).

■ In *Smith,* we cited with approval the standard set forth in *Shepherdstown Volunteer Fire Department v. State ex rel. State of West Virginia,* 172 W.Va. 627, 309 S.E.2d 342 (1983), as applicable to this Court's review of orders issued by the HRC. In syllabus point 2 of *Shepherdstown Volunteer Fire Department* we held:

*et seq.* "shall apply to and govern the hearing and the administrative procedures in connection with and following [a] hearing" before the HRC unless otherwise provided in Chapter 5, Article 11. Parties are not required to appeal to the circuit court, but may elect this option under three specific circumstances.

Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions, or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Syl. Pt. 2, *Shepherdstown Volunteer Fire Department.* With these principles in mind, we examine the Administrative Law Judge's August 23, 2003 Final Decision which was adopted in its entirety by the HRC on January 30, 2004.

## III.

## DISCUSSION

■ The HRC's Final Order finds in favor of Krystal and Beverly Wattie on their complaints of racial discrimination and reprisal asserted against Barbara Cobb, a teacher at Riverside High School. Through its adoption of the Administrative Law Judge's Final Decision, the HRC found "as a matter of fact and of law, that [Ms. Cobb] created a racially hostile environment for [Krystal], which interfered in [Krytal's] enjoyment of equal access to the public accommodation of public schooling."

This Court *"shall reverse, vacate* or modify the order or decision of the [HRC] if the substantial rights of the [Appellant] have been prejudiced because the administrative findings, inferences, conclusions, decisions, or order are: '. . . (5) *Clearly wrong in view of the reliable, probative and substantial evidence on the whole record;* or (6) *Arbitrary or capricious or characterized by abuse of discretion* or clearly unwarranted exercise of discretion.' " Syl. Pt. 2, *Shepherdstown Volunteer Fire Department* (emphasis added). This Court's review of many of the material findings of fact and conclusions of law made by the Administrative Law Judge and adopted by the HRC reveals the findings and conclusions are not supported by evidence on the record and are "clearly wrong in view of the reliable, probative and substantial evidence on the whole record." As demonstrated by the following discussion of several findings and conclusions made by the Administrative Law Judge and adopted by the HRC, a disturbing number of the findings and conclusions are arbitrary, capricious and characterized by abuse of discretion. Collectively, the type and number of blatant errors in the findings below by the Administrative Law Judge greatly trouble the Court and raise profound questions regarding the fundamental fairness afforded Ms. Cobb, individually, and the school system generally in the administrative process below.

For example, the Administrative Law Judge, in Finding of Fact 5, states: "Principal Clendenin admitted that Respondent was in conflict with the African American students in her second semester 9th Grade English Class, and that his suggestion was to remove the African–American students from Respondent's class." The record reveals that there were at least four and possibly more African American students in Ms. Cobb's second semester 9th Grade English Class. Principal Clendenin actually testified that there were problems with only one or two African American students in the class besides Krystal. Only Krystal and A.W. were given the option of being removed from the class. This Court can find no testimony by Principal Clendenin or P.B., another African American student in the class and a friend of Krystal, that there was conflict with all the African American students in Ms. Cobb's class. The only testimony regarding conflict with *all* African American students in the class was offered by Krystal.

Additionally, Finding of Fact 6 states: "Assistant Principal Potter testified credibly that Respondent sent discipline slips for Com-

plainant [Krystal] for being part of a group of African American students who were too loud and disruptive in the hallways." Ms. Potter's specific testimony was:

Q: Okay, let me ask this, let's get this straight. Were you ever—did you ever get any disciplinary forms from Ms. Cobb concerning Krystal Wattie?

A: I know that she and I verbally talked. As for writing, I don't have those records in front of me. They would be input into the computer under the County system, but to testify that, yes, I directly received something in writing, I can't recall that.

Further, Ms. Potter testified that she doesn't recall Ms. Cobb ever discussing race when discussing noise caused by "a group of students" in the hallways. Moreover, Ms. Potter testified that she did not believe Ms. Cobb's complaints regarding the noise from this group were unfounded as she had received complaints from other teachers and had witnessed the behavior herself.

Moreover, Finding of Fact 7 states: "During the first nine weeks that Respondent taught, according to Principle Clendenin, [Krystal] had a B in the Respondent's 9th Grade, 2nd Semester English Class, even though she was number one in the class as far as the graded assignments that were posted." Actually, Principal Clendenin's testimony is silent as to any reference to Krystal's grades in Ms. Cobb's English Class. This finding's correct reference in the record is not to Principal Clendenin, but instead, Krystal herself.[20] There is simply no other basis for this finding in the record.

Furthermore, Finding of Fact 10, in discussing the library incident, states: "This precipitated a big argument between Complainant and Respondent, with the Complainant being taken to the office." To the contrary, the record, including part of Krystal's own testimony and that of P.B., her friend, indicates that Ms. Cobb did not take Krystal to the office (Krystal alleges that she was told to go the office, a statement contradicted by both P.B. and Ms. Cobb), but that Krystal left the library voluntarily against Ms. Cobb's instruction.

Penultimately, Finding of Fact 13 states: "When Complainant and her African American friends were attending football games, Respondent complained that they were staring at her and on one occasion, that she saw [Krystal] mouth the word 'you B* * * *'. Principle Clendenin threatened her [Krystal] with expulsion and instructed them to remain by the gate, away from Respondent." Principal Clendenin never mentioned expulsion in any context at any time during his testimony. The only mention of expulsion *in the entire record* was the following testimony by Krystal:

Q: During that tenth grade year, did Ms. Cobb ever make any comments to you about expulsion?

A: No.

Q: You don't recall anything?

A: No.

Moreover, only *one* football game was mentioned during the hearing. Krystal did not testify that Mr. Clendenin had stated Ms. Cobb accused Krystal of making the alleged comment. The only possible basis for any part of Finding of Fact 13 was the testimony of P.B., who was with Krystal at a football game. The actual record shows that P.B.

---

**20.** If a party's recollection of what someone told them (arguably, self-serving hearsay) is sufficient without more in the eyes of this Administrative Law Judge to support a finding of fact, then one may reasonably question why the Administrative Law Judge did not also make a finding of fact that Principal Clendenin advised Ms. Cobb to seek a restraining order against Beverly Wattie and to file a harassment complaint against Krystal Wattie. The HRC introduced into evidence, without limitation, notes authored by Ms. Cobb documenting incidents with Krystal and the school administration's response thereto. Ms. Cobb's December 6, 2000, note written after the hallway incident with Beverly Wattie involving the visitor's pass indicate that Mr. Clendenin advised her to file for a restraining order against Beverly Wattie and to file a harassment complaint against Krystal. Moreover, Ms. Cobb heard reports of Krystal stating she would "knock the wig off" Ms. Cobb's head one day at the Town Center (Ms. Cobb apparently wore a wig as a result of treatment for cancer). If hearsay is sufficient to establish a fact, then all semblance of justice is lost. West Virginia law requires more. HRC proceedings are bound by the *West Virginia Rules of Evidence*. See W. Va.Code § 29A–5–2(a) (1964); W. Va.Code § 55–11–10 (1994).

testified that Ms. Cobb had alleged A.W., not Krystal, made the comment referred to by the Administrative Law Judge. Furthermore, P.B.'s testimony is silent as to any reference to expulsion.

Finally, Finding of Fact 21 states: "The Complainant was continually being sent to the office for being at her locker during the jump start period." The record reveals only one incident, discussed above, where Krystal went to the office after Ms. Cobb caught her at her locker during Jump Start. As indicated above, Krystal admits going to the office on her own accord and being *followed by Ms. Cobb.* Krystal also testified that Principal Clendenin made notes each time she was sent to the office. Although the HRC called several Riverside High School administrators, including Principal Clendenin, as witnesses at the hearing, the testimony of these witnesses does not support any finding that Krystal was "continually being sent to the office" by Ms. Cobb. In fact, to the contrary, both Principal Clendenin and Ms. Potters testified that referrals to the office by Ms. Cobb were *not* frequent. Office documentation regarding office referrals, particularly Principal Clendenin's notes, was not introduced into evidence nor discussed during the testimony of the administrators.

The Administrative Law Judge's Order Discussion is also suspect. In this regard, the Administrative Law Judge notes, "Respondent's consistent refusal to provide [Krystal] with make up assignments and her failure to accurately record and grade [Krystal's] work is indicative of racial bias." The record instead reveals only one instance where Ms. Cobb allegedly refused to provide Krystal with a make-up assignment[21] and one incident where Ms. Cobb allegedly failed to accurately record and grade her work (the summer reading assignment). It is unclear what the basis is for the reference to a "consistent refusal," in this discussion.

Additionally, Order Discussion states: "Respondent continually was sending both AW and [Krystal] to the office for offences which did not result in white students being disciplined similarly." To the contrary, the record reveals that more white students were referred to the office by Ms. Cobb than were African American students for similar offenses.

Order Discussion states further: "Respondent made several references to fear of violence from [Krystal] and [Beverly] which simply had no explanation other than as a stereotype of African Americans generally." The Administrative Law Judge provides no support for this finding. This finding is directly contradicted by the incidents related above and the testimony of other witnesses that Ms. Cobb attempted to avoid any contact with Krystal.

Moreover, Order Discussion states: "Whether or not Respondent, Ms. Cobb, consciously believes that she is racially discriminating, the fact that all four African American Students were given the 'opportunity' to remove themselves from her class, clearly indicates that a racial issue existed in fact for her students, notwithstanding that only one of the four elected to leave." As noted above, the testimony reveals that only two students, Krystal and A.W., were provided with the option of transferring from Ms. Cobb's class.

Lastly, Order Discussion states: "The efforts of Respondent to discipline [Krystal] for being in the halls during jump start, even after being informed that she should not engage in hall monitoring duties or interact with [Krystal] by the principal, clearly reeks of retaliation for filing of the Human Rights complaint." The incident where Ms. Cobb attempted to discipline Krystal for being in the halls during Jump Start occurred on or about October 11, 2000. The initial complaint in this matter was not filed until April 2001, nearly six months *later.*[22] This Court

---

**21.** Krystal testified that she asked Ms. Cobb for make-up work during class and that Ms. Cobb told her "now is not the time." Krystal then sought intervention from an administrator to obtain the assignment.

**22.** As previously noted, the initial April 2001 complaint was not included in the record submitted to this Court for review. The only complaint contained in the record before this Court is the September 21, 2001 complaint which is denominated an "amended complaint." This "amend-

cannot fathom how an incident occurring nearly six months *prior* to the filing of a complaint can be deemed to "clearly reek[ ] of retaliation for filing" the complaint. At a minimum, this reference highlights a disturbing pattern of exaggerations and outright inaccuracies by the Administrative Law Judge below, errors which raise for us troubling questions regarding the fundamental fairness and justice accorded Ms. Cobb in the hearing underlying the instant appeal.[23]

■ This Court cannot and will not condone misrepresentations of facts erected by judges, administrative or otherwise, as foundations for what can only be seen on review as judging to reach a predetermined result— here, a finding of discrimination. We observe that these distortions seemed to occur mainly in the findings of "fact" which serve as the basis to justify a determination of discrimination.

In light of the above identifications of misrepresentations of the record in the factual findings relied upon below, this Court has no choice but to find the Final Order issued by the HRC clearly wrong in view of the reliable, probative and substantial evidence on the whole record. It is arbitrary, capricious and characterized by an abuse of discretion and we reverse the same.

■ The question then becomes whether to simply reverse the HRC's Final Order or to reverse and remand the matter for the reconsideration of the actual evidence on the record. In making this determination, we look to see whether there is some evidence on the record which could support a finding in favor of Krystal and Beverly Wattie if this matter is remanded for reconsideration and the issuance of findings of fact and conclusions of law which are actually supported by some evidence in the record. Previously, this Court has held:

> In an action to redress unlawful discriminatory practices in employment and access to 'place[s] of public accommodations' under The West Virginia Human Rights Act,

as amended, W. Va.Code, 5–11–1 *et seq.,* the *burden is upon the complainant to prove by a preponderance of the evidence* a prima facie case of discrimination.... If the complainant is successful in creating this rebuttable presumption of discrimination, the *burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection.* Should the respondent succeed in rebutting the presumption of discrimination, then the *complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext* for the unlawful discrimination. Syl. pt. 3, in part, *Shepherdstown VFD v. W. Va. Human Rights Comm'n,* 172 W.Va. 627, 309 S.E.2d 342 (1983).

Syl. Pt. 4, *Conaway v. Eastern Assoc. Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986) (emphasis added). Further,

In order to make a prima facie case of discrimination in a place of public accommodation, the complainant must prove the following elements: (a) that the complainant is a member of a protected class; (b) that the complainant attempted to avail himself of the "accommodations, advantages, privileges or services" of a place of public accommodation; and (c) that the "accommodations, advantages, privileges or services" were withheld, denied or refused to the complainant.

Syl. Pt. 1, *K–Mart Corp. v. West Virginia Human Rights Comm'n,* 181 W.Va. 473, 383 S.E.2d 277 (1989). In *K–Mart,* 181 W.Va. at 477, 383 S.E.2d at 281, fn. 6, *quoting Conaway,* 178 W.Va. at 171, 358 S.E.2d at 430, we stated that the non-discriminatory reason given in rebuttal "need not be one which the judge or jury would have acted upon" and "can be any other reason except that the [complainant] was a member of a protected class." In order to overcome a showing of non-discriminatory reason, the complainant must demonstrate *by a preponderance of*

---

ed complaint" was filed nearly a year *after* the incident in question.

**23.** The errors herein listed are but a subset of those found by this Court in its review of the

Administrative Law Judge's decision. These errors being sufficiently demonstrative, we choose not to include others.

*evidence* that the claimed non-discriminatory reason was merely a pretext. Syl. Pt. 4, *Conaway*. Pretext may be demonstrated by showing that the articulated reasons were implausible. Syl. Pt. 5, *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995) (holding that after a non-discriminatory justification for action is articulated, "a plaintiff need not show more than the articulated reasons were implausible and, thus, pretexual" in order to defeat a motion for directed verdict).

 Even if we were to assume that a *prima facie* case of discrimination was established,[24] Appellant has presented ample evidence of a non-discriminatory reason for the actions taken against Krystal, *i.e.*, imposition of discipline for unacceptable behavior by a high school student. Findings relating to the bad behavior of student Krystal Wattie, including problems with noise, tardiness, comments made to Ms. Cobb, and the complaints of other teachers regarding Krystal's behavior, are amply supported by the testimony of various witnesses, including Krystal's *own* testimony. W. Va.Code § 18A–5–1, which governs a teacher's authority, provides, in part:

(a) The teacher shall stand in the place of the parent(s), guardian(s) or custodian(s) in exercising authority over the school and shall have control of all pupils enrolled in the school from the time they reach the school until they have returned to their respective homes[.]

* * *

(c) The teacher shall have authority to exclude from his or her classroom or school bus any pupil who is guilty of disorderly conduct; who in any manner interferes with an orderly educational process; who threatens, abuses or otherwise intimidates or attempts to intimidate a school employee or a pupil; or who willfully disobeys a school employee; or who uses abusive or profane language directed at a school employee.

* * *

(g) For the purposes of this section: (1) "Pupil or student" shall include any child, youth or adult who is enrolled in any instructional program ... under public school direction [.] ... and (2) "teacher" shall mean all professional educators as defined in section one, article one of this chapter[.]

According to this statute, Ms. Cobb stands *in loco parentis* to her students and was authorized and, arguably, required to impose appropriate discipline when and where needed.[25] *See* Syl. Pt. 4, *Smith v. W. Va. State Bd. of Educ.*, 170 W.Va. 593, 295 S.E.2d 680 (1982) (holding *in loco parentis* doctrine codified in W. Va.Code § 18A–5–1 does not prohibit certain forms of physical punishment in disciplining public school students); *Rogliano v. Fayette Cnty. Bd. of Educ.*, 176 W.Va. 700, 705, 347 S.E.2d 220, 226 (1986) (Neeley, J., dissenting) (recognizing that "teachers are not merely instructors in sciences and letters. They are authority figures, role models, behavioral examples, surrogate parents. After a fashion, teachers stand in loco parentis. Children learn much more from their teachers than the quadratic equation and the proper spelling of 'dirndl'—they learn important values and morals. One of the most important values children learn from their teachers is respect for the law."). Thus, we hold, West Virginia public school teachers and school administrators stand *in loco parentis* to their students and are authorized to impose appropriate discipline in order to maintain an orderly environment in the schools necessary to educate our children.

 Education is the cornerstone of our society. Article XII, Section I of the *West Virginia Constitution* mandates that "[t]he legislature shall provide, by general law, for

24. The only possible evidence of racial bias on the part of Ms. Cobb is a comment made, allegedly referring to Krystal and A. W., that it was in their nature to be loud.

25. Our opinion herein is not inconsistent with our prior decision in *Smith* wherein we held, in Syllabus Point 3, "[t]he doctrine of *in loco paren-* *tis*, as contained in W. Va.Code, 18A–5–1, in light of the present day standards and legislative enactments in the child abuse area cannot be interpreted as permitting corporal punishment of public school children by means of a paddle, whip, stick or other mechanical devices."

a thorough and efficient system of free schools." "The mandatory requirements of 'a thorough and efficient · system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental constitutional right in this State." Syl. Pt. 3, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979); Syl. Pt. 1, *Cathe A. v. Doddridge County Bd. of Educ.,* 200 W.Va. 521, 490 S.E.2d 340 (1997). Moreover, this Court has recognized, on several occasions, that "the State has a compelling interest in providing a *safe and secure environment* to the school children of this State." Syl. Pt. 3, in part, *Cathe A.* (emphasis added); *see also* Syl. Pt. 3, *J.M. v. Webster County Bd. of Educ.,* 207 W.Va. 496, 534 S.E.2d 50 (2000). In *Phillip Leon M. v. Greenbrier County Board of Education,* 199 W.Va. 400, 484 S.E.2d 909 (1996) we held, in syllabus point 4:

> Implicit within the West Virginia constitutional guarantee of a 'thorough and efficient system of free schools' is the need for a safe and secure school environment. Without a safe and secure environment, a school is unable to fulfill its basic purpose of providing an education.

Syl. Pt. 4, in part, *Phillip Leone M.; Cathe A.,* 200 W.Va. at 528, 490 S.E.2d at 347, *quoting, Phillip Leone M .* . In *Cathe A.,* we likewise noted:

> Conduct by a student, whether in class or out, whether it stems from the time, place, or type of behavior, which materially disrupts class work or involves the substantial disorder or invasion of the rights of others, is not constitutionally immunized. An individual does not have the right to exercise his fundamental constitutional rights at all times, under all circumstances, and by all methods.

*Cathe A.,* at 528, at 347, *quoting, Keith D. v. Ball,* 177 W.Va. 93, 95, 350 S.E.2d 720, 722–23 (1986)(internal citations omitted).

 Consistent with providing a safe and secure environment and providing a "thorough and efficient education" is the ability to maintain order and discipline in the classroom and hallways of our public schools. Where a student's unruly behavior is left unchecked, the student infringes upon other students' rights to a "thorough and efficient education." Thus, one of the paramount responsibilities of a teacher is to maintain order and discipline while instructing students on the academic subjects. An orderly learning environment is absolutely necessary for teachers to teach and for students to be able to learn. Such discipline also prepares students for life. In *J.M,* we recognized "that almost any student charged with any violation at school is likely to make all manner of excuses for his or her actions." *J.M.,* 207 W.Va. at 503, 534 S.E.2d at 57. Discipline should be imposed where appropriate to maintain order in our public schools and to facilitate all students' educational experiences. This is not to say that discipline may be imposed in a discriminatory manner or for discriminatory reasons. Rather, discipline in schools which is imposed in a nondiscriminatory manner should not be discouraged where it is deemed to be necessary for the maintenance of an appropriate learning environment in West Virginia schools.

 Accordingly, we hold that Article XII, Section 1 of the West Virginia Constitution, which guarantees the right to a thorough and efficient education, requires West Virginia public schools and teachers to impose such discipline as is reasonably required to maintain order in our public schools and to facilitate the education of our children. Where discipline of a student or students is deemed necessary to the maintenance of an orderly educational process, West Virginia public schools can and should impose such reasonable discipline in an even-handed and racially-blind manner. Discipline imposed upon a minority student does not alone equate to racial discrimination unless there is a preponderance of evidence that the discipline was imposed in a discriminatory manner or for a discriminatory purpose. Even if discrimination is shown by a preponderance of the evidence, this Court must then take the next step in the analysis to determine if there is a legitimate, nondiscriminatory reason for the discrimination, and if such finding is made, whether the reason is merely a pretext.

■ Our review of the record in this case indicates that even if one were to conclude that the Watties met their initial burden, the HRC cannot establish pretext by a preponderance of the evidence.[26] Krystal admits Ms. Cobb was not the only teacher or administrator to discipline her or complain about her presence and noise in the hallways. Krystal also admits to confronting Ms. Cobb on a number of occasions and to being tardy for class. Our review of the record as a whole and in the light most favorable to the HRC on behalf of Krystal and Beverly Wattie does not reveal sufficient evidence to prove that Ms. Cobb's attempts to discipline Krystal were more likely than not due to Krystal's race or that such discipline was imposed in a racially discriminatory manner. To the contrary, the record reveals a compelling case for the need of appropriate discipline in this case. Therefore, remand is not necessary.

■ Although we are reversing the HRC's January 30, 2004 Order in the instant matter, this Court recognizes the important role the HRC plays in attempting to rid our society of unlawful discriminatory conduct. No person, including a high school student, should be subject to unlawful discrimination. However, there must be proof sufficient to meet the standards previously articulated by this Court that unlawful discrimination actually have occurred before liability may be imposed. Otherwise, the legitimacy of the HRC will be brought into question, putting at risk the vital and important role served by the HRC. The HRC must ensure that its decisions are made in a fair and even-handed manner, and, unlike here, based on the *actual* evidence introduced on the record before it.

## IV.

### CONCLUSION

We find the January 30, 2004 Final Order issued by the West Virginia Human Rights Commission herein to be clearly wrong in light of the reliable, probative and substantial evidence within the whole record and further find said Order to be arbitrary, capricious and characterized by an abuse of discretion. Our review of the record as a whole indicates a lack of evidence sufficient to demonstrate pretext by a preponderance of evidence when viewed in the light most favorable to the complainants.[27] Therefore, the January 30, 2004 Final Order of the West Virginia Human Rights Commission is reversed.

Reversed

STARCHER, J., dissenting.

(Filed July 14, 2005)

I reviewed the briefs of the parties in the instant case, and reviewed the record as well, and I can only conclude that I am looking at a totally different case from the one reviewed by the majority of this Court.

First, I dissent to the majority opinion's elevation of this case to one of constitutional dimensions. The parties neither briefed nor argued, before this Court or any lower tribunal, the question of whether teachers have a constitutional right to impose discipline upon public school students. Yet somehow, in Syllabus Point 8, the majority opinion concludes as a matter of law that Article XII, Section 1 of the *West Virginia Constitution* "requires public schools and teachers to impose such discipline as is reasonably required to maintain order in our public schools[.]"

Second, the briefs and arguments of the parties are largely in agreement on the facts, and do not—repeat, do not—challenge the administrative law judge's findings of fact. Instead, appellant Barbara Cobb challenged the *inferences* that the administrative law judge drew from those facts. These were inferences drawn by the judge who heard the witnesses testify, and who saw the witnesses' demeanor. It is well-settled law that when conflicting inferences can be drawn from facts, appellate courts will defer to the fact finder's determination.

**26.** The generally accepted meaning of preponderance of the evidence is "more likely than not." *Jackson v. State Farm Mut. Auto. Ins. Co.,* 215 W.Va. 634, 640, 600 S.E.2d 346, 352 (2004).

**27.** This conclusion is reached only after assuming arguendo, that the complainant was able to prove a prima facie case of discrimination.

The majority opinion, unfortunately, bypassed the parties' briefs and arguments and invented a new point of error that was simply not raised by the appellant's attorney. Somehow, looking at the same record that was scrutinized by skilled attorneys representing the appellant and the Human Rights Commission—attorneys who also saw and heard the witnesses—the majority found a "number of blatant errors in the findings below." The majority opinion finds undotted "i's" and uncrossed "t's" in the administrative law judge's opinion where the attorneys saw none, and then uses these alleged errors to find that a teacher's racial discrimination against a student is permissible, so long as the teacher buries the discrimination under the guise of "discipline."

Here is what I saw in the record: Ms. Wattie, an African American, began attending Riverside High School as a ninth grader and continued attending through her senior year. For the first few months of Ms. Wattie's second semester as a ninth grader—in the spring of 2000—she attended appellant Cobb's English class. Ms. Cobb took a medical leave of absence during the latter months of the semester, and Ms. Wattie never again enrolled in one of Ms. Cobb's classes.

Beginning in the spring of 2000, when Ms. Wattie was in Ms. Cobb's class, Ms. Cobb began a course of racial harassment. And, when Ms. Wattie and her mother (Beverly Wattie) objected, Ms. Cobb undertook a course of retaliation. For instance, the record indicates that Ms. Cobb would provide assignments or make up work to students who missed her class, but would not do so for Ms. Wattie. Ms. Cobb would not acknowledge Ms. Wattie when she raised her hand in class, and would lock her out of class if she was late. Ms. Cobb repeatedly posted a grade sheet for the class reflecting that Ms. Wattie had failed to turn in assignments—

assignments which had been graded and returned to her. When Ms. Wattie tried to correct these mistakes, Ms. Cobb repeatedly told her that it was "not the time to bring that up." It also appears that Ms. Cobb repeatedly sent Ms. Wattie to the office for being loud, apparently justifying it once by saying to Ms. Wattie, "I talked to my boyfriend about you ... and he said it's in your all's nature to be loud like that." The record also indicates that Ms. Cobb would "fuss at" most African American students who asked questions in class,[1] but would vigorously argue with Ms. Wattie and often send her to the office for discipline. The students could not recall similar attention being directed toward white students.

When Ms. Wattie and other students—in concert with their parents—objected to Ms. Cobb's conduct to the school administration, the school's principal admitted that Ms. Cobb was in conflict with the African American students in the 9th grade English class. However, the principal's suggestion to ease the conflict was to remove the African American students from Ms. Cobb's class. Ms. Wattie's mother refused to have her daughter transferred.[2]

The record indicates that Ms. Wattie did well academically in Ms. Cobb's class—she was ranked number one in Ms. Cobb's class as far as posted graded assignments—yet received a "B" grade from Ms. Cobb.[3] After Ms. Cobb took a medical leave of absence and the class was taught by a substitute, Ms. Wattie's grade improved to an "A."

Ms. Wattie did not have Ms. Cobb as a teacher after the ninth grade. However, after Ms. Cobb returned to teach in the fall of 2000, and throughout Ms. Wattie's remaining years of high school, it appears that Ms. Cobb regularly confronted Ms. Wattie in the school's hallways. Ms. Cobb repeatedly sent

---

1. One African American student testified that she asked Ms. Cobb if she could have a Post-it Note to make a note for her locker. Ms. Cobb pulled a pad out from her desk said "You can go get some from someone else."

2. Other parents approved the transfers, and the school's principal noted that students "did fine" once they were transferred out of Ms. Cobb's class. However, he also acknowledged the objections made by Ms. Wattie's mother: that it would be wrong for Ms. Wattie to alter her situation to fix a problem created by Ms. Cobb.

3. At the time of Ms. Wattie's testimony in January 2003, she testified that her semester grade point average was 4.0, and her cumulative high school grade point average was 3.61. Ms. Wattie graduated in May 2003.

discipline slips to the office for Ms. Wattie because she was allegedly being loud and disruptive in the hallways. Ms. Cobb acknowledged that other students who engaged in similar conduct were not reprimanded, but contended that those others were "good students." Ms. Wattie acknowledged that the noise in the hallways involving her and other students was brought to her attention by other teachers, but none of these other teachers referred her to the office.

The record indicates that the confrontations between Ms. Cobb and Ms. Wattie escalated. Ms. Cobb asserts that her actions were merely attempts to discipline an unruly student. One teacher testified to finding Ms. Cobb and Ms. Wattie heatedly arguing in the hallway. The teacher intervened and separated the two and led Ms. Wattie away; Ms. Cobb pursued, coming face to face with the teacher, pointing her finger at Ms. Wattie's face and saying "it's a good thing this lady intervened when she did because I don't know what would have happened." [4]

Both the school principal—who stated he had "a number of conversations about this issue" with Ms. Cobb—and the superintendent of the school board attempted to diffuse the situation by explicitly telling Ms. Cobb that she should avoid contact with Ms. Wattie. Furthermore, an aide was assigned to Ms. Wattie to escort her between classes. Still, the record suggests that Ms. Cobb sought out Ms. Wattie for disciplinary action. For instance, a teacher who was a native of Pakistan and who taught a specialized, university-based science and technology program, testified that she had Ms. Wattie as a student for her entire four years of high school. While the teacher had no disciplinary problems with Ms. Wattie during that time, she recalled that Ms. Cobb approached her in the teachers' lounge and demanded she remove Ms. Wattie from the program. When the teacher declined, Ms. Cobb moved very close to the teacher, pointed a finger at her and said, "[W]homever taught you English did an injustice to you" while imitating the teacher's accent. [5]

Ms. Wattie's complaint to the Human Rights Commission was brought against Ms. Cobb and two other parties: the Kanawha County Board of Education, and another teacher, Jennifer Cavendar–McNeil. The complaint alleged that Ms. Cobb and Ms. Cavendar–McNeil had created a racially hostile environment, and that the school system

---

**4.** The record suggests that the only other incident where another teacher sent Ms. Wattie to the office for being in the hallways was initiated by a friend of Ms. Cobb, Jennifer Cavendar–McNeil. When Ms. Cavendar–McNeil told Ms. Wattie to move along and she did not, Ms. Cavendar–McNeil grabbed Ms. Wattie by the arm. An administrative law judge acknowledged that while both "being shouldered" and being grabbed by the arm could technically constitute a battery, he also concluded that "[i]n neither instance is criminal prosecution remotely appropriate."

**5.** The teacher, who was born in Pakistan, taught for six years at the British School System in Pakistan, for one year in England, and for twenty-one years in Kanawha County. She has been a citizen of the United States since 1979.

Her specific testimony regarding the incident with Ms. Cobb is, in relevant part, this:

One time we were—me and another HSTA [Health Science Technology Academy] teacher, we were downstairs in lounge, teacher's lounge, we were making some coffee, and Ms. Cobb, she stopped us and told us that you have to do something about Krystal.... [S]he said one of your HSTA students, she attacked me or assaulted me....

I said, I'm not here to take any student out from HSTA or even take in, we have to send the application, if they're approved by the Board, then, they are in HSTA and if the Board approves it, but the student did not meet our departments of HSTA then they are going to be taken out....

So, at that point ... she just—I mean, she was very—getting very close to me with her finger on almost on me and she said where did you get your education, okay, like—and I told her, I have Master's, two Master's Degrees, and she said—whomever taught you English did an injustice to you. She said—and she was very, very close to me and I was really, I mean, I was trying to get back ... and I shoved her back a little bit, so, at this point I was really calm at that point, really very calm, and she said that—I think she said that—whatever she was talking [about], it was imitating my accent talking.

Ms. Cobb left shortly thereafter, telling the teacher she would return to continue the discussion. The teacher waited for Ms. Cobb to return, but then left saying "I'm not going to listen to this crap, what she is saying, so, I left. And I was really very tense, I mean, felt very insulted[.]"

780

had done nothing to correct or eliminate the hostility. The school board and Ms. Cavendar–McNeil later settled with Ms. Wattie in exchange for a payment of $3,200.00; an agreement to refrain from future discrimination and to respond to discrimination allegations in the future; and an agreement to revise the school's multicultural diversity and Black History Month programs.

The administrative law judge reviewed the evidence presented against Ms. Cobb. The judge found numerous facts which, when taken together, inferred that Ms. Cobb had created a hostile environment for Ms. Wattie motivated by Ms. Wattie's race. The administrative law judge found, based upon Ms. Cobb's own testimony and demeanor, that Ms. Cobb resented Ms. Wattie; that she acted in a racially disparate fashion toward African Americans; and that she made racially stereotypical comments. The judge found that "Whether or not ... Ms. Cobb[ ] consciously believes that she is racially discriminating" was unimportant because her actions "clearly indicate[ ] that a racial issue existed in fact for her students[.]" The actions of Ms. Cobb interfered in Ms. Wattie's right to enjoy equal access to a public accommodation, the public school system, and caused her humiliation, embarrassment, emotional distress and loss of personal dignity.

I agree that the administrative law judge found, as a matter of fact, that Ms. Wattie was chronically tardy to Ms. Cobb's class, and that she and her friends were frequently loud and disruptive in the school hallways, during her 9th grade year. The judge also found that Ms. Wattie was sometimes combative and confrontational with Ms. Cobb, goading Ms. Cobb by muttering things like "just let her say something" or gossiping to her peers about Ms. Cobb in ways calculated to embarrass Ms. Cobb. The administrative law judge acknowledged that the behavioral shortcomings of Ms. Wattie provided a legitimate explanation for some of Ms. Cobb's disciplinary actions. However, the judge also found that many of Ms. Cobb's explanations were merely a pretext for discrimination, or that Ms. Cobb's actions toward Ms. Wattie would not have been undertaken absent a discriminatory motive. Taking Ms. Wattie's conduct into account, the judge only ordered

Ms. Cobb to pay Ms. Wattie $500.00 in damages for her humiliation, embarrassment, emotional distress and loss of personal dignity, Ms. Cobb was also ordered to cease and desist from any future discrimination, and to pay the reasonable costs incurred by the Commission in prosecuting the case, in the amount of $1,426.31.

It cannot be disputed that Ms. Wattie was a member of a protected class as an African American. Furthermore, there is substantial evidence in the record that a racially hostile environment was created by Ms. Cobb, and that Ms. Cobb had denied or curtailed certain advantages, privileges and services to Ms. Wattie—advantages, privileges and/or services that were freely enjoyed by other students. I believe that the administrative law judge fairly found from the evidence that Ms. Cobb effectively denied Ms. Wattie her right to the public accommodation of attending a public school. I therefore dissent to the majority's substitution of its own interpretation of the record for that of the administrative law judge.

No one can argue that a teacher has a right to impose order in the classroom. But when the teacher's actions are motivated by a student's race, and as a result of those motivations the student is denied accommodations that are freely given to other students, the Human Rights Commission is constituted and empowered to intervene and award the student some relief. The administrative law judge for the Commission in this case saw the evidence, watched and heard the witnesses, and drew inferences from the record as a whole that racial discrimination occurred. The majority opinion wrongly supplanted its own arguments for those of the parties, examined the record piecemeal, and drew its own inferences from the record to conclude that discrimination never occurred, and even if it did, the teacher had a constitutional right to impose discipline in her courtroom in whatever fashion she chose.

I therefore respectfully dissent to the majority's opinion, and state that Chief Justice Albright joins me in this separate opinion.