IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

_____

No. 15-1197

_____

FILED

March 9, 2017

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA DIVISION OF MOTOR VEHICLES,
Petitioner, Respondent below

v.

RENEE L. RICHARDSON-POWERS, Respondent, Petitioner below,
and WEST VIRGINIA HUMAN RIGHTS COMMISSION,
Respondent

_____

Appeal from the West Virginia Human Rights Commission
Docket No. EDS-94-12

REVERSED

_____

Submitted:  January 25, 2017
Filed:  March 9, 2017

Patrick Morrisey, Esq.
Attorney General
Mary M. Downey, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Petitioner

Garry G. Geffert, Esq.
Martinsburg, West Virginia
Counsel for Richardson-Powers

Ann L. Haight, Esq.
Deputy Attorney General
Jerry R. Fowler II, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Human Rights Commission

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS


1. "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." Syl. Pt. 1, *W.Va. Human Rights Comm'n v. United Transp. Union*, *Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981).


2. "To state a claim for breach of the duty of reasonable accommodation under the West Virginia Human Rights Act, W.Va. Code, 5-11-9 (1992), a plaintiff must [have] alleged the following elements: (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation." Syl. Pt. 2, *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 479 S.E.2d 561 (1996).

LOUGHRY, Chief Justice:

The West Virginia Division of Motor Vehicles ("DMV"), appeals from an adverse finding of discrimination against it by the West Virginia Human Rights Commission ("Commission"). The DMV challenges multiple findings of the Commission including its ruling that the respondent Renee Richardson-Powers ("Ms. Powers") proved a prima facie case of discrimination;[1] that the DMV failed to provide the accommodations requested by Ms. Powers; that Ms. Powers mitigated her damages; and that the administrative law judge's ("ALJ's") findings of fact were supported by the evidence.[2] Upon our careful and thorough review of the record in this case against these assignments of error, we find that the Commission committed error and, accordingly, reverse.

## I. Factual and Procedural Background

Ms. Powers purportedly suffered a traumatic brain injury in a fall from a ledge near the Lincoln Memorial in Washington, D.C., when she was eight years old.[3] As a result

---

[1]*See* W.Va. Code § 5-11-9 (2013).

[2]The DMV also challenges the Commission's findings that it did not engage in the interactive process, while Ms. Powers did, and that it engaged in spoliation of evidence.

[3]There are no medical records to support this diagnosis. We note additionally that on December 17, 2009, Ms. Powers told Harold Slaughter, a psychologist she was referred to by the West Virginia Division of Rehabilitation Services ("DOR"), that she sustained this injury as the result of performing gymnastics when she was nine years old. Ms. Powers told Ms. Frick, her DMV supervisor, that the brain injury resulted from "a severe car accident."

1

of this injury, Ms. Powers testified she has some degree of hearing loss and struggles to find the correct words to express herself. Dr. James Petrick, Ph.D., a clinical neuropsychologist who examined Ms. Powers,[4] testified she has "cognitive deficits" due to the neurological trauma. One of those specific deficits is a reduction of "her capacity to learn efficiently." He further testified that her perseverative tendencies make problem solving difficult, noting that people with such tendencies tend to "get stuck." In explanation, he opined: "[T]hey decide there's one way to do something, and, and they can't be flexible with their thinking." Based on the information Ms. Powers provided to Dr. Petrick, he agreed with her self-assessment that structure, repetition, and consistency[5] were necessary for her to learn new tasks.

In 2010, Ms. Powers applied for a customer service representative ("CSR") position with the DMV.[6] Upon being hired to work at the Kearneysville DMV office, she

---

Dismissing "[t]hese supposed inconsistencies . . . [as] simply not relevant," the ALJ concluded that "[t]he entomology of those mental impairments has no bearing on the elements of the causes of action" at issue.

[4]Dr. Petrick examined Ms. Powers on August 25, 2010–five months *after* she began working at the DMV.

[5]*See infra* note 28.

[6]After being laid off from her job in May 2009, Ms. Powers sought assistance from Workforce West Virginia and was referred to the DOR to help her find employment; she located the DMV position without the assistance of the DOR.

began her probationary employment on March 22, 2010.[7] Ms. Powers did not disclose the existence of her traumatic brain injury when she was initially interviewed by the DMV or later when she began her employment as a CSR.[8] At the start of her CSR training, all Ms. Powers told Christine Frick, the office manager, was that she learned by repetition and that "she liked to take lots of notes." Ms. Powers began her CSR training with Angie Kuykendall. According to Ms. Kuykendall, she provided Ms. Powers with a notebook that contained documents pertinent to issuing driver's licenses and to license renewals and further enabled her to take additional notes regarding the various DMV procedures she was undertaking to learn. At the end of one week, Ms. Kuykendall requested that she be relieved from training Ms. Powers due to difficulties she was experiencing that included Ms. Powers' refusal to take notes, her uncooperative attitude with regard to the training, and her failure to remain at the DMV window with her trainer.[9]

---

[7]The probationary period of employment was six months.

[8]Several weeks into her employment, Ms. Powers told the office manager, Christine Frick, she had a brain injury and that was why she was having trouble retaining information. When asked what was necessary to help her learn, Ms. Powers indicated taking notes and repetition. Ms. Powers made it clear to Ms. Frick that she did not want her co-workers to know of the brain injury. Due to privacy issues, Ms. Frick testified she could not inform those co-workers about Ms. Powers' brain-related injury.

[9]Throughout the training log maintained on Ms. Powers, the trainers commented on Ms. Powers wandering away from the window at which she was assigned to be trained; Ms. Powers denies that she ever left her assigned window. A notation in the log dated April 5, 2010, states: "Renee does not want to run the window or stay at her station, continues to wander until management tells her to get back to her trainer."

3

Danetta Calhoun, the second DMV employee to train Ms. Powers, raised concerns similar to those expressed by Ms. Kuykendall. Addressing Ms. Powers' challenges to Ms. Calhoun's training, Ms. Frick noted in the training log:[10] "she [Ms. Powers] is not questioning because she does not understand, she is questioning because she does not like the way Danetta is processing the transaction." Ms. Calhoun further opined that Ms. Powers "has a negative attitude towards training and seems like she knows it all, already." Also included in the log for this week is this observation: "Renee still refuses to take notes as she has been told by management and her trainers. Renee is coming to management to complain about her co-workers."

When Ms. Frick spoke with Ms. Powers with regard to the issues raised by the trainers, Ms. Powers revealed that a brain injury affected her ability to retain information. In response, Ms. Frick "reiterated the fact about taking notes. Notes will benefit her processing transactions. I also told her that I would provide her with resources to use when she is finished training and working on her own. She then went on again to complain about her trainer's way of doing things."[11]

---

[10]While Ms. Frick compiled the training log, reports submitted by the individual trainers of Ms. Powers were used to complete the log.

[11]This entry is from the training log entry dated March 28, 2010, to April 1, 2010.

4

After seven days of working with Ms. Calhoun, Ms. Powers was moved to a third CSR for training purposes. During the week that Terry Graves was her trainer, Ms. Powers got upset with Ms. Graves for correcting her in front of a customer and complained to Ms. Frick. Ms. Frick explained that it was the duty of Ms. Graves, as her trainer, to make sure the customer was not given inexact information or sent away unnecessarily. Despite recognizing that "she is probably explaining things incorrectly," Ms. Powers still did not feel she should be remonstrated in front of a customer. Ms. Graves observed that Ms. Powers "is focusing to[o] much on minor details instead of the primary details of the job." The log entry for April 7, 2010, reflects that "Renee [Ms. Powers] comes to management to say what Terry [Graves] has told her and then questions if Terry is correct. Renee does not believe what she is being told by her trainers. Terry states that Renee is not taking the amount of notes that she should and refuses to do so when Terry suggests it to her."

Although Ms. Powers was assigned her own window beginning on April 11, 2010, she was continuing to struggle with handling basic license tag renewals and driver's licenses.[12] According to the log, Ms. Powers "continues to leave her window for almost every transaction to come to management for help." The log entry for the week of April 25 to 30, 2010, reflects that Ms. Powers "is still questioning at each transaction and asking how

---

[12]These two DMV transactions are the easiest transactions to process, according to the testimony of Ms. Frick.

to process and what is needed. She is not referring to her resources or notes as we have told her. States it is easier to come and ask." The following week's log indicates that Ms. Powers "will not take the help given by CSR's as instructed and management can not stand with her to answer her questions at each transaction."[13]

Ms. Frick noted in the log for May 9 to 14, 2010, that she tried to switch Ms. Powers over to titles "to have her learn some more job duties and she is visibly upset about this." The entry made by Ms. Frick in the log for the following week states: "I have tried everything possible to help Renee [Powers] with the problems she is having with learning her job duties. I have provided numerous resources and cheat sheets and sat with her and talked with her in detail at great lengths. I have asked Renee for input and have complied with her requests." Ms. Frick observed in the log entry for May 16 to 21, 2010, "that Renee is not willing to work with her co-workers."[14]

---

[13]The log reflects for the week of May 2 to 7, 2010:

> [A]s long as someone was working with her she was fine and not questioning at all. She knew what needed to be done and did it. It wasn't until that management member walked away did she start asking questions again. Renee [Powers] admitted repeatedly that she is retaining the information but doesn't like working on her own because she is afraid she will make a mistake.

[14]Additional information related to dealing with her co-workers is set forth in the log entry for May 24 to 28, 2010:

> She is not meeting the goals set and again is refusing to use any

6

Ms. Powers met with Ms. Frick and Karrie Whittington, the office supervisor, on May 27, 2010, for a sixty-day performance review. Expectations and goals were discussed and Ms. Powers said she "would work on doing better." When Ms. Powers claimed to have "never been given any resources to help her," Ms. Frick disputed this contention and "then she admitted that she has them but just doesn't use them."[15] Citing her brain injury, Ms. Powers requested additional training on May 28, 2010. She told Ms. Frick "that she did not like her training . . . and that none of the CSR's do anything correctly."

Ms. Frick got approval from the Regional Coordinator, Carol Huggins, for additional training for Ms. Powers. After training Ms. Powers for more than a week, Becky Heddon observed that she "can do her job as long as someone sits with her at all times." When Ms. Powers asked for even more training on June 11, 2010, she was told by Ms. Frick that "management feels that she is able to work independently . . . at this point." To which, Ms. Powers stated "that she does know her job but just doesn't want to make a mistake."

of the information that she has been given by other CSR's to make her job easier and more understandable. CSR's still complaining about Renee [Powers] giving customers wrong information and being rude to the employees when they try to help her. CSR's do not understand why Renee will not allow them to assist her. They all say that she just blows them off and will not listen. Does things her own way; which is incorrect but then will blame the other CSR's when . . . ask[ed] . . . why she processed something wrong or gave wrong information.

[15]In explanation, Ms. Powers stated "it is just more convenient to come ask questions to management only instead of taking the time to refer to her resources we provided."

The log entries for June 14 through July 9, 2010, relate that Ms. Powers was continuing to question "all she is told,"[16] was "not using notes or resources provided," and was refusing to rely on co-workers for assistance.[17] Additional notations for this same period indicate that Ms. Powers "is still not giving correct information to customers" and that she "is not showing the performance level she should for this far into employment."[18]

Ms. Frick and Ms. Whittington met with Ms. Powers on July 12, 2010, to discuss her ninety-day evaluation/review. As documented in the training log, Ms. Powers "did not agree with the discussion and said that it was not her fault but the trainers fault from day 1. She went on to blame co-workers for her mistakes and giving wrong information and lack of performance." The next day, Ms. Powers requested that Ms. Frick contact her brain

---

[16]Ms. Frick expanded: "She is not questioning in a manner of not understanding, it is in a manner of disbelief."

[17]When directed by management to go to a co-worker, Ms. Powers relatedly "gives them an attitude about it."

[18]As the record evidences, Ms. Powers intermittently contacted Ms.Lockard, her DOR counselor, to inquire about training (which was unavailable due to her current employment status) and to discuss her difficulty in learning her job duties. Ms. Lockard communicated with Ms. Powers on June 7, 2010, about meeting to complete an individual plan for employment aimed at work accommodations and job retention, but that meeting never took place.

trauma counselor, Ms. Teresa Cunningham. Ms. Frick told Ms. Powers that she could not do that.[19]

Ms. Powers contacted Penny Hall, the state director of the Americans with Disability Act ("ADA"). Ms. Hall contacted Ms. Frick by telephone on July 22, 2010, to inquire why she would not meet with Ms. Cunningham. Ms. Frick informed Ms. Hall that she "ha[d] not received anything from Renee [Powers] in writing from her doctor to prove the disability and that Renee has not told her the complete story of her poor evaluations." Ms. Frick also communicated to Ms. Hall that Ms. Powers "continues to change the story around whether she has been diagnosed or not diagnosed" with a disability.[20]

Five days later, Ms. Powers was informed by letter from the Director, Human Resources Division, West Virginia Department of Transportation ("DOT") that she could apply for a "reasonable accommodation under the ADA." Ms. Powers filled out a series of

---

[19]According to both her testimony and her log entry corresponding to this request, Ms. Frick explained that without specific disability documentation, they were not authorized to make this type of contact. At this point, Ms. Powers had not provided the DMV with any documentation evidencing the existence of a brain trauma-related disability.

[20]Ms. Lockard, the DOR Counselor assigned to Ms. Powers, observed in her case notes dated July 13, 2010, that Ms. Powers was "considering whether and when she will share this report [Dr. Slaughter's psychological report dated December 17, 2009, diagnosing her with a traumatic brain injury] with her supervisor."

forms requesting an accommodation on July 30, 2010.[21] The specific accommodation requested by Ms. Powers was to learn in a step-by-step procedure format and through repetition. On September 15, 2010, the DOT/DMV accommodation committee denied her request, stating:

> The information submitted demonstrated that the local Division of Motor Vehicles office previously made multiple attempts to assist you in learning the duties of a Customer Service Representative in ways that are consistent with your request as noted above [step by step procedure format and through repetition]. In addition, the methods employed by DMV staff to train you in your job are consistent with the recommendations of Ms. Cunningham. Based upon these unsuccessful attempts, it is apparent that, assuming that you are disabled, no reasonable accommodation would enable you to perform the essential functions of your job.

On September 16, 2010, Ms. Powers was notified that effective September 30, 2010, her employment with the DMV was being terminated.[22] On September 28, 2010, Ms. Powers filed a grievance with regard to her termination. After eight days of hearing evidence,[23] Robert B. Wilson, the ALJ, issued his final decision on September 11, 2014, finding in favor of Ms. Powers and awarding her front and back pay, attorney's fees, and

---

[21]When she sought this accommodation, she had yet to be seen by Dr. Petrick. The first time that consistency in terms of both the trainers and the steps employed to achieve a particular task is mentioned is in Dr. Petrick's report, dated August 25, 2010.

[22]Her last day of work was September 20, 2010.

[23]The hearings were held in December 2013 and February 2014.

directing that she be reinstated.[24]  By order entered on November 9, 2015, the Human Rights

Commission adopted the decision of Judge Wilson.[25]   It is from this order that the DMV

now appeals.

## II. Standard of Review

As we detailed in *Smith v. West Virginia Human Rights Commission*, 216

W.Va. 2, 602 S.E.2d 445 (2004), the Commission reviews the decision of an ALJ pursuant

to the statutory procedures set forth in West Virginia Code § 5-11-8(d)(3).[26]  216 W.Va. at

---

[24]Through her cross-appeal, Ms. Powers objected to the award of reinstatement, arguing that the reinstatement was not possible given the animosity between the parties.

[25]The Commission awarded back pay damages in the amount of $12,906.00 for the period of unemployment following her termination on September 30, 2010, to December 31, 2010, plus interest.  To reflect the difference between Ms. Powers' current part-time employment and full-time employment, an additional award of back pay and benefits was made in the amounts of $11,259.99 for 2011; $6,912.00 for 2012, $13,248.99 for 2013 and $15,443.00 for 2014 plus interest.  The Commission awarded Ms. Powers $5,000.00 for humiliation, embarrassment, emotional distress and loss of dignity as well as $189,106.86 in attorney's fees.

[26]Those standards limit the Commission's review to determining whether the ALJ's decision is:

> (A) In conformity with the constitution and the laws of the state
> and the United States;
> (B) Within the commission's statutory jurisdiction or authority;
> (C) Made in accordance with procedures required by law or
> established by appropriate rules of the commission:
> (D) Supported by substantial evidence on the whole record; or
> (E) Not arbitrary, capricious or characterized by abuse of
> discretion or clearly unwarranted exercise of discretion.

11

6, 602 S.E.2d at 449. When this Court reviews the Commission's ruling, we are governed by the reviewing standards set forth in the Administrative Procedures Act. *See* W.Va. Code § 29A-5-4(g) (2015); *accord* Syl. Pt. 1, *Cobb v. W.Va. Human Rights Comm'n*, 217 W.Va. 761, 619 S.E.2d 274 (2005). To reverse, vacate, or modify the Commission's order requires a determination that

> the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are:
>
> (1) In violation of constitutional or statutory provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedures; or
> (4) Affected by other error of law; or
> (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W.Va. Code § 29A-5-4(g).

As we first pronounced in syllabus point one of *West Virginia Human Rights Commission v. United Transportation Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981), "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are

---

W.Va. Code § 5-11-8(d)(3).

unchallenged by the parties."[27]  *See also* Syl. Pt. 1, in part, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996) (stating that this Court "reviews questions of law presented *de novo*, findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong"). Credibility determinations made by an ALJ "are binding unless patently without basis in the record." *Martin v. Randolph Bd. of Educ.*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995).  In contrast to the deference extended to the factual determinations of an ALJ provided such determinations are "supported by substantial evidence," the ALJ's interpretation of the law or application of the facts to law are not treated deferentially.  *See id.* at 304, 465 S.E.2d at 406.  With these standards in mind, we proceed to determine whether the rights of the DMV were prejudiced by the ruling of the Commission.

### III.  Discussion

The DMV challenges the legal conclusion reached by the ALJ, and affirmed by the Commission, that Ms. Powers demonstrated by a preponderance of the evidence that the DMV breached its duty to provide her with a reasonable accommodation.  The elements

---

[27]When West Virginia Code § 5-11-11 was amended in 1987 to provide for a direct appeal from the Commission to this body, the Commission's findings of fact continued to be reviewed pursuant to the "substantial evidence" test.  *KVRTA v. W.Va. Human Rights Comm'n*, 181 W.Va. 675, 677 n.1, 383 S.E.2d 857, 859 n.1 (1989).

13

necessary to prove such a claim were set forth in syllabus point two of *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 479 S.E.2d 561 (1996):

> To state a claim for breach of the duty of reasonable accommodation under the West Virginia Human Rights Act, W.Va. Code, 5-11-9 (1992), a plaintiff must [have] alleged the following elements: (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

As Justice Cleckley explained in *Skaggs*, an employer has two means of defending against such a claim: "by disputing any of the above elements or by proving that making such accommodation would impose an undue hardship on the employer." 198 W.Va. at 66, 479 S.E.2d at 576.

In the instant case, the DMV specifically challenges the first element, which required Ms. Powers to demonstrate she was "a qualified person with a disability." Under both our case law and our regulations, a "qualified person with a disability" is an individual "who is able and competent, *with reasonable accommodations*, to perform the essential functions of the job." *See* Syl. Pt. 1, in part, *Coffman v. W.Va. Bd. of Regents*, 182 W.Va. 73, 386 S.E.2d 1 (1988), *overruled on other grounds by Skaggs*, 198 W.Va. 51, 479 S.E.2d 561; W. Va. Code R. § 77-4-2. By statute, only an individual who is "able and competent

14

to perform the services required" of a particular employment position is entitled to seek relief on the grounds of unlawful discrimination under the West Virginia Human Rights Act. *See* W.Va. Code § 5-11-9(1) (2013). And, as we clarified in *Ranger Fuel Corp. v. West Virginia Human Rights Commission*, 180 W.Va. 260, 376 S.E.2d 154 (1988), "[t]he 'able and competent' requirement means that an employer has the right not to hire or to fire employees who are unable to perform a job because either they are generally unqualified or they have a handicap that impedes job performance, subject to the 'reasonable accommodation' requirement." *Id.* at 265, 376 S.E.2d at 159.

The DMV maintains that Ms. Powers was not capable of performing the essential functions of her job, even with the specific accommodation she requested: step-by-step training, note taking and repetition.[28] Although a typical CSR trainee would complete his or her training in two to four weeks, Ms. Powers was still struggling after months to operate a DMV window unassisted.[29] Both the training logs and the testimony

---

[28]Not until Ms. Powers pursued a grievance did she identify consistency as a component of the step-by-step training she required. Because the individual CSR employers who trained Ms. Powers might approach the same task in a slightly different order (same steps, just a different order), she complains that this rendered her training ineffectual.

[29]When deposed in this case, Ms. Powers said that at the time of her termination–six months after being hired–she had still not completed the training she required to perform the job. As she explained: "I still needed so much more in different things that – of training, different licenses, different areas of that job." Besides her need for additional training on existing procedures, she stated that "[i]f a new process comes in, I would need training. Unless I do the process over and over, I would constantly need assistance . . . ."

of the CSR workers and DMV supervisors indicate that Ms. Powers was not competently operating a DMV window independent of supervisory assistance despite months of hands-on and over-the-shoulder instruction. Of additional concern to the DMV was Ms. Powers' apparent failure to fully appreciate the need to give customers accurate information in the first instance and to treat them respectfully.

While the ALJ has numerous findings of fact with regard to past employment positions that Ms. Powers successfully held,[30] the record in this case does not adequately address whether those prior positions involved comparable job duties and responsibilities. In his "Statement of the Case," the ALJ relates that:

> The Complainant has provided evidence that when coworkers are aware of her condition, which causes her to have to repeatedly ask questions, and present the tasks necessary to perform a job function in a consistent step-by-step format, she can be successful. This is demonstrated by a work history involving similar customer service positions, which Complainant has held for extended periods of time with performance that was recognized and rewarded by her previous employers.

In the Discussion section of the Final Decision, the ALJ concludes:

> Ms. Richardson-Powers has demonstrated that she is capable of performing similar customer service jobs in the past, when she has explained her learning problems to her co-

---

[30]Her prior instances of employment included a rental car agent; a cashier; a bank teller; and an order fulfillment coordinator. Over the objection of the DMV, the ALJ allowed Ms. Powers' sister to testify to the receipt of work-related commendations.

16

workers. . . . The evidence established that she has a record of helpful courteous interaction with those prior employers' customers. . . .The preponderance of the evidence suggests that with accommodation, Ms. Powers is able to perform the duties of customer service representative with Respondent, DMV.

For the ALJ to presume that the job duties at the prior positions held by Ms. Powers were sufficiently similar in nature to those of a DMV CSR with no testimony to that effect was improper. The singular fact of dealing with the public across a counter does not automatically render the prior employment positions comparable to the specific demands and tasks of the CSR position.[31] What the ALJ overlooked is that part of what affected the ability of Ms. Powers to learn and then successfully perform a given job in the past was determined by the sheer repetitive nature of the tasks required.[32] Unlike those positions, which Ms. Powers testified to as involving rote procedures, the CSR position presented issues that required problem solving–a task that would be difficult for her according to Dr. Petrick. Critically, and contrary to the ALJ's avowal that Ms. Powers previously disclosed her traumatic brain injury to prior employers and co-workers, the record suggests just the

[31]When Ms. Powers filled out employment information at the DOR, she indicated she would not consider a position that was fast-paced or required her to read. When interviewed by the DMV, she did not reveal either of these concerns.

[32]Not only did Ms. Powers testify to the routine nature of her job as a cash office associate and her rental car counter position, but in completing a work history document in connection with her application for social security disability benefits, she also described the bulk of her prior work positions as involving rote and repetitive tasks: "they gave me the same thing over and over."

17

opposite. Ms. Powers made it clear she preferred not to disclose her condition/injury to her current coworkers for fear of being judged. She told Ms. Lockard, her DOR counselor, that she had not revealed this information to her coworkers in the past.

Because Ms. Powers did not previously disclose her traumatic brain injury to her previous co-workers and employers, the ALJ wrongfully concluded that where her specific needs had been made known and then properly accommodated, she could succeed. Given the specific lack of any request for an accommodation in those prior employment settings,[33] the ALJ's reasoning that Ms. Powers could handle the CSR position with an accommodation is decidedly unfounded. Moreover, the fact that the approach that worked for her in the past (note taking, repetition, step-by-step learning) did not work in this instance suggests a dissimilar job in terms of employment-related tasks rather than a failure to accommodate her learning-related needs. Seemingly overlooked by the ALJ and then the Commission is copious evidence that Ms. Powers regularly refused to take additional notes

---

[33]The ALJ wrongly conflates the prior instances where Ms. Powers reportedly told her prior employers that she learned from repetition and step-by-step training as a specific request for an accommodation within the framework of discrimination law. There is nothing in the record to suggest that Ms. Powers informed any of her prior employers that she had a disability or that she pursued an ADA-related request for an accommodation based on that disability with those prior employers.

18

when so directed and also refused to reference notes she had made, preferring instead to seek supervisory assistance.[34]

Completely ignored by the ALJ is the insight that Ms. Powers' own witness, Dr. Petrick, provided concerning her employment-related issues at the DMV. According to Dr. Petrick's report and testimony, Ms. Powers has a "Mood Disorder" related to her traumatic brain injury and he specifically advised that she should be "instructed as to how her behavioral and emotional status might be adversely effecting [sic] her capacity to maintain employment."[35] When presented with the training log notes that indicated Ms. Powers was getting frustrated by her trainers, being angry, refusing to use her notes, and not paying attention, Dr. Petrick viewed those behaviors as emotional sequela from her brain trauma. He described her personality as "perseverative, sticky, inflexible, emotional dyscontrol, anger, frustration, tangential, and obsessive." Dr. Petrick stated he was not at all "surprised" at the frustration experienced by the CSR workers who trained Ms. Powers: "because of how Ms. Powers presents in terms of social interaction, her personal style would probably cause a coworker to be frustrated." In light of these characteristics, he further

---

[34]And while the ALJ opted to discredit the testimony of various DMV witnesses as to the use of written materials based on the non-production of these materials, Ms. Powers herself testified both to note taking and to the use of a grey notebook for reference purposes.

[35]Part of what drove Ms. Powers to contact her DOR counselor was concern that she was going to lose her job. She informed Dr. Petrick that she "has had some difficulty maintaining employment."

19

acknowledged that supervisors and even customers might experience frustration in dealing with Ms. Powers.[36]

During his evidentiary deposition, Dr. Petrick testified that the DMV CSR position was not a good position for Ms. Powers "[b]ecause it requires novel problem-solving. Every customer is different. Every situation, to some extent, is different, and . . . . [e]very day is different." After expressing his lack of surprise that Ms. Powers' "failed in this particular job," Dr. Petrick opined that the failure resulted due to "a combination of her injury, the training, and the job itself." With an "infinite amount of time" and training, Dr. Petrick believed that Ms. Powers could eventually do the job, but he could not determine how long that might take. In completing her social security disability application, Ms. Powers represented that she "became unable to work because of my disabling condition on September 30, 2010"–her last day of employment at the DMV. Her application for disability benefits was denied with the following explanation: "We realize that your condition prevents you from doing your past job as a license clerk, but based on your age, education, work experience, it does not prevent you from doing less demanding work." [37]

[36]Dr. Petrick testified as to Ms. Powers being tangential, explaining her inability to respond in a linear fashion. Rather than answering a question, Ms. Powers might address wholly unrelated topics for multiple sentences before finally getting around to the actual inquiry. According to Dr. Petrick, they ran out of time during the interview because of this condition and further characterized her as "taxing" to deal with in the interview.

[37] Consistent with Dr. Petrick's recommendation that part-time work would be better for her, Ms. Powers is currently holding such a position of employment.

Incumbent in our review of administrative cases such as these is the duty to "determine whether the ALJ's findings were reasoned, *i.e.,* whether he or she considered the relevant factors and explained the facts and policy concerns on which he or she relied, and whether those facts have some basis in the record." *Martin*, 195 W.Va. at 304, 465 S.E.2d at 406. Upon our review of the full record in this case, we find no evidence to support the ALJ's conclusion that Ms. Powers is qualified to perform the essential functions of the CSR job with a reasonable accommodation. The DMV gave Ms. Powers exactly what she requested from day one–the opportunity to take notes, step-by-step instruction, and repetition. As the record makes clear, Ms. Powers was given months of additional training assistance but she repeatedly hindered that process by her unwillingness to accept what her trainers told her and by refusing to refer to her own notes. And, by her own words, after six months she still did not view herself as fully trained. Dr. Petrick testified that her failure was caused not just by the training but by the very nature of the job itself. The job duties cannot be altered so as to give Ms. Powers a slow-paced and essentially identical day-to-day work experience. The varying transactions that present to a CSR simply cannot be formulaically-simplified to suit Ms. Powers. This employer cannot be expected to provide an "infinite" amount of open-ended training until she fully grasps the permutations of the job. What the ALJ should have discerned, after months of exposure to the facts of this case, is that this employment position was simply not a good fit for Ms. Powers. While the law requires that

21

disabled individuals be given the same opportunities as nondisabled persons,[38] the law does not permanently tie the hands of an employer with regard to making personnel decisions. *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3rd Cir. 1998) (finding proposed accommodation to internally transfer employee whenever employee becomes stressed out by coworkers or supervisor as improper request to establish conditions of his employment).

Although we are reversing the Commission's ruling on the ground that Ms. Powers failed to meet the initial burden of demonstrating she was a "qualified person with a disability," there are numerous additional grounds for reversal that we are not addressing.[39] *See* Syl. Pt. 2, *Skaggs*, 198 W.Va. at 58, 479 S.E.2d at 568. What the record makes clear is that Ms. Powers failed to demonstrate her ability and competency to perform the CSR job with reasonable accommodations. In stark contrast to the ALJ's conclusion that the DMV discriminated against Ms. Powers by failing to provide a reasonable accommodation, the record reveals an employer that was exceedingly patient with Ms. Powers, both with her

---

[38]*See Wernick v. Fed. Reserve Bank*, 91 F.3d 379, 384 (2nd Cir. 1996).

[39]The inferences taken by the ALJ based on its conclusion of spoliation were unnecessarily broad and improper. The reliance on biased, self-serving testimony as to proof of the "success" of Ms. Powers in her former positions was improperly relied upon by the ALJ. The ALJ's use of any discrepancy between discovery testimony and trial testimony as a basis for wholesale exclusion of the witness' testimony was erroneous. The employer was wrongly faulted by the ALJ for not informing Ms. Powers' co-workers of her alleged condition–a condition that she herself chose not to be made known.

requests for extended training and her need to learn the job through repetition, note taking, and in a step-by-step fashion.

From the outset of the final order, the ALJ vilified the DMV as unreasonable and unwilling to accommodate the needs of Ms. Powers. The employer in this case was faulted by the ALJ for the inadequate training it provided Ms. Powers from day one when Ms. Powers did not reveal her brain trauma incident, much less the existence of an actual disability until weeks or even months into her employment. In its order, the ALJ improperly expanded the scope of what Ms. Powers asked for from the DMV in terms of assistance in learning the job. She never, not even when she submitted an actual request for an accommodation, included a request for absolute consistency in terms of the steps by which she was instructed. The ALJ's failure to consider the evidence of Ms. Powers' personal responsibility regarding her training issues further suggests a fundamentally flawed outcome. Given the pattern exhibited by Ms. Powers of refusing to accept what any given trainer told her, preferring instead to seek help from her supervisors, it is doubtful that this employer could have ever found the perfect trainer, someone that Ms. Powers would actually listen to and learn from.[40] When viewed against the record in this case, the ALJ's decision reflects "a disturbing pattern of exaggerations and outright inaccuracies" seemingly designed "to

---

[40]According to the testimony of Ms. Whittington, Ms. Powers didn't trust her co-workers: "She was combative. . . . she didn't want to . . . listen to anything anyone said. If it wasn't what she thought was supposed to [be] done, she didn't want to hear it."

23

justify a determination of discrimination." *Cobb*, 217 W.Va. at 774, 619 S.E.2d at 287.[41]

As in *Cobb*, this Court will not allow the deferential standard of review regarding an ALJ"s credibility and factual determinations to be used as a tool to accomplish a desired result. And neither should the Commission.[42]

## IV.  Conclusion

Based on the foregoing, the decision of the Commission is reversed.

Reversed.

---

[41]It is not lost on this Court that the ALJ who heard and decided this case was also the ALJ in *Cobb*.

[42]Because the Commission's order relies heavily on the standard of review as its basis for adopting the ALJ's decision and because the Commission did not take issue with even one statement, inference, or evidentiary exclusion, it appears that the Commission's review of this matter was perfunctory.  We do note that the Commission reduced the ALJ's $6,000 award for incidental damages to $5,000, which is the current maximum amount for such damages.  The Commission viewed the improper award as a "typographical error."